[redacted]

**UNITED STATES of America**
**v.**
**Leon JAMES, Appellant.**

**UNITED STATES of America**
**v.**
**Enrico TANTILLO, Appellant.**

**UNITED STATES of America**
**v.**
**Robert VERDEROSA, Appellant.**

**UNITED STATES of America**
**v.**
**Lawrence W. JACKSON, Appellant.**

**UNITED STATES of America**
**v.**
**Carl W. BROOKS, Appellant.**

**Nos. 71-1168, 72-1489, 71-1192, 72-1488, 71-1193, 72-1483, 71-1215, 71-1216.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1972.

Decided Feb. 4, 1974.

Rehearing Denied April 15, 1974.

[redacted]

[redacted]

Edward J. Cull, Washington, D. C., with whom George M. Coburn, Washington, D. C. (both appointed by this Court) was on the brief, for appellant in Nos. 71–1168 and 72–1489.

Joel M. Finkelstein, Washington, D. C., with whom James L. Rider, Washington, D. C., was on the brief, for appellants in Nos. 71–1192, 72–1488, 71–1193 and 72–1483.

John A. Shorter, Jr., Washington, D. C., with whom William A. Bonders was on the brief, for appellants in Nos. 71–1215 and 71–1216.

Roger E. Zuckerman and James L. Lyons, Asst. U. S. Attys., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Theodore Wieseman, Robert E. L. Eaton, Jr., Asst. U. S. Attys., were on the brief for appellee.

Before WINTER,* Circuit Judge for the Fourth Circuit, and MacKINNON and ROBB, Circuit Judges.

ROBB, Circuit Judge:

 The appellants and Carmine Paladino and Mary Davis, both now dead, were indicted for conspiracy to sell narcotics in violation of 26 U.S.C. §§ 7237(b) and 4705(a), and conspiracy to receive and conceal narcotic drugs, knowing them to have been illegally imported. 21 U.S.C. § 174.[1] Jackson, Tantillo, Paladino, Verderosa and James were also indicted for substantive violations of the narcotics laws. All except James were convicted of conspiracy and of various substantive offenses. James was convicted of certain substantive offenses, but acquitted of conspiracy by direction of the court.[2]

The case for the government depended upon evidence of telephone communications and conversations intercepted and recorded by agents of the Bureau of Narcotics and Dangerous Drugs (Bureau). The interceptions were authorized by District Judge William B. Jones, pursuant to 18 U.S.C. §§ 2510–2520 (1970).

The communications intercepted by the government agents took place over two telephones, one, listed as 582–9265, located at 201—53rd Street, S.E., Washington, D. C., Apartment 2, and the other, listed as 399–3695, at 3676–A Hayes Street, N.E., Washington, D. C., Apartment 301. On July 9, 1969 Judge Jones entered an order authorizing the interception of communications over telephone 582–9265. Interception commenced on July 11, 1969 and continued, pursuant to the order of July 9 and an extension of authority granted by Judge Jones, until August 19. On August 1, 1969 Judge Jones authorized the interception of communications over telephone 399–3695. Interception under this authority began on August 1 and continued until August 19.

During the periods when the intercepting devices were in place government agents recorded all communications over the two telephones. Many of the communications were put in evidence before the jury and were the basis of the government's case. From this evidence the jury was justified in finding that the appellant Jackson was in the business of selling narcotic drugs in the City of Washington, and that arrangements for the purchase, sale and delivery of drugs were made over the two telephones. More than 5,000 telephone calls were intercepted, 70% of which related to the sale or purchase of narcotics. The jury was also justified in finding that the appellants Tantillo and Verderosa, who lived in New York, were Jackson's suppliers.

## I. CONSTITUTIONALITY

 The appellants contend that the statute under which their conversations

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. These statutes were repealed, Pub.L. 91–513, 84 Stat. 1291–92, Oct. 27, 1970.

2. After this acquittal, counsel for James moved for severance of the substantive counts, Fed.R.Crim.P. 14. The motion was denied. This court has consistently held that such a decision is within the sound discretion of the trial judge. See, e. g., United States v. Wilson, 140 U.S.App.D.C. 220, 434 F.2d 494 (1970); United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971). In ruling on the motion, Judge Robinson carefully considered the claim that James would be prejudiced by a failure to sever. Judge Robinson reviewed the evidence which had been introduced at trial to determine whether James had been "tainted" by association with the other defendants. He also reviewed the nature of the substantive charges against James and the evidence which had been introduced to support them. (Tr. 5343–52). He was of the opinion that the jury would be able to compartmentalize the evidence as to James, and careful instructions on the matter were given to the jury. (Tr. 5729–30, 5758–62). In these circumstances, we think the motion for severance was properly denied. Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L. Ed.2d 921, rehearing denied, 363 U.S. 858, 80 S.Ct. 1605, 4 L.Ed.2d 1739 (1960); United States v. Kaufman, 311 F.2d 695 (2d Cir. 1963).

were intercepted, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970), is unconstitutional on its face. We reject this contention without replowing the ground which has been thoroughly and ably covered by many other courts. *See* United States v. Tortorello, 480 F.2d 764 (2d Cir. 1973), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); United States v. Cafero, 473 F.2d 489 (3d Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3018 (Mar. 26, 1973); United States v. Bobo, 477 F.2d 974 (4th Cir. 1973), petition for cert. filed sub nom., United States v. Gray, 42 U.S.L.W. 3167 (Aug. 2, 1973); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Cox, 449 F.2d 679 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

## II. VALIDITY OF THE COURT ORDERS

By a motion to suppress the appellants attacked the orders of the District Court authorizing the interception of their telephone communications. They contended that there was no probable cause for the issuance of the District Court's order and that the procedures in other ways failed to comply with the requirements of the statute. After pretrial hearings, lasting for twenty-one days, District Judge Robinson denied the motion. We think he was right.

The underpinning of the application for wiretap authorization was an affidavit of Special Agent John F. Cody of the Bureau of Narcotics and Dangerous Drugs, United States Department of Justice. The affidavit recited that Lawrence Jackson was well known to Bureau agents as a major violator of the narcotics laws, although he had no record of narcotics convictions. He had been the subject of a continuing investigation by the Bureau since 1966 but efforts to make a case against him had failed because of the "tight security" under which he operated and which enabled him to identify the Bureau's undercover agents. He had no legitimate means of support but owned a 1969 Lincoln Continental sedan, dressed in expensive clothes and spent money lavishly.

An informer, referred to in the affidavit as SE–2–9–0011, but later identified as George Lewis, told Agent Cody that Jackson was one of the largest wholesale narcotics dealers in the Washington area. He volunteered his services in making a case against Jackson.[3] His reliability had been demonstrated when his information and services enabled the Bureau to make four cases against major violators in the Washington area. In these cases Lewis, in company with Bureau agents, made seven purchases of high-quality heroin.

On June 17, 1969 Lewis telephoned Jackson at 399–3695. Cody monitored the call with Lewis' permission. A woman who answered the telephone said that Jackson was at "the 582 number" which she could not disclose without Jackson's permission. When Lewis called the woman back she told him that the number was 582–9265 and that if Jackson asked how he obtained the num-

3. Because Agent Smith had told Lewis that a reward of $1500 would be recommended upon the completion of the case, although no payment had been made by the time of the trial, appellants Tantillo and Verderosa contend that a contingent fee arrangement existed which violated due process. Williamson v. United States, 311 F.2d 441 (5th Cir. 1962). Without expressing an opinion on the soundness of the *Williamson* decision, *but see* United States v. Grimes, 438 F.2d 391 (6th Cir.), cert. denied, 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155 (1971), we think the facts of this case do not bring it within the *Williamson* rationale. It is undisputed that the possibility of a reward was not discussed until after Lewis had come forward with his information about Jackson. Before Lewis came forward the agents knew that Jackson was an active dealer in narcotics. There was no question of entrapment as there was in the *Williamson* case. *See* United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Finally, Lewis was subjected to thorough and exhaustive cross-examination about the circumstances of the reward discussion and the nature of the arrangement.

ber to say she had given it to him. Lewis then called 582–9265 and was told by a man who answered that Jackson was not there but was at 396–9755. Reached at 396–9755, listed to a barbershop, Jackson offered to sell Lewis for $1500 an ounce of heroin that could "stand nine cuts". Lewis agreed to buy a half ounce for $750 and this transaction took place on June 19. The half ounce of heroin proved to be 88.5% pure. Although a Bureau agent accompanied Lewis to the meeting with Jackson, and surveillance by other agents was attempted, "Jackson made three check turns and one U-turn in an obvious effort to detect a surveillance" (Cody Affidavit ¶ 8) and then took Lewis alone to the point where the narcotics were secreted, approximately five blocks from the meeting point.

On June 23 Lewis telephoned 582–9265, Agent Cody again monitoring the call with Lewis' permission. A man who answered the telephone said Jackson was not there but he was usually there every day to receive telephone calls and generally arrived around 2:00 P.M. The following morning Lewis reached Jackson at the 399 number and arranged to purchase an ounce of heroin of the same purity as that purchased on June 19. Later that day, in the presence of Agent Wilder, Jackson sold Lewis 23.500 grams of 65.2% pure heroin. The price was $1500. Although Agent Wilder was able to witness the sale, Jackson told Lewis that he would not sell any heroin to strangers and that Wilder should not be included in any future transactions. Agent Cody, who was in the vicinity of the transaction, observed several men believed to be associates of Jackson who were touring the area, apparently searching for surveillance teams. Directly after this transfer of heroin Jackson drove to 201—53rd Street, S.E. where the 582–9265 telephone was located.

The affidavit of Agent Cody recited further that by subpoena to the Chesapeake and Potomac Telephone Company he learned that the telephone number 582–9265 was listed to Richard M. James at the 53rd Street, S.E. address. The records reflected that on January 27, 1969 three toll calls were made from this telephone to 512—723–4937; on January 30 there was one such call, one on February 8 and one on February 13. There were two calls to 512—723–4937 on February 14, five on February 18 and one on April 17. The telephone number 512—723–4937 was listed to Amelia Rendon, 201 Coke Street, Laredo, Texas.

Laredo, Texas was known to Cody as the main point on the Texas border for the smuggling of contraband and narcotics from Mexico to the United States. On June 26, 1969 Cody was informed by Special Agent Thormalen of the Bureau's San Antonio office that his office had received information to the effect that Rendon of Coke Street, Laredo, was a courier of narcotics from Mexico to Chicago and Washington, and that Rendon was associated with a well-known narcotics smuggler by the name of Marshallino Meriz. Meriz, according to Bureau files, was associated with one Francisco Flores, alias Poncho, a Mexican born in Laredo, who was operating a restaurant in Washington, D. C. Flores had been under investigation by the Bureau and was suspected of being a major smuggler of narcotics from Mexico to Washington. On October 30, 1966 a girl friend of Flores was arrested at Laredo, Texas, in possession of thirteen ounces of heroin.

Concluding his affidavit Agent Cody stated that extensive surveillance of Jackson was continuing but was not productive because of his extreme caution. In addition, he lived in a densely populated area and was closely associated with several of his neighbors who were prepared to alert him to danger. His local telephone calls were of course not noted on the subpoenaed records.

Cody submitted that probable cause existed to believe that Jackson had used and would continue to use the telephone listed as 582–9265 at 201—53rd Street, S.E., Apartment 2, Washington, D. C., in the commission of offenses involving the

importation of narcotics and a conspiracy to do so. He requested an order pursuant to 18 U.S.C. § 2518 authorizing the interception of wire communications over telephone 582–9265 for a period of thirty days. Finally, he submitted that no other investigative procedure reasonably appeared likely to succeed.

The appellants contend that (1) Agent Cody's affidavit did not contain allegations sufficient to constitute probable cause for the issuance of a wiretap order; (2) Cody did not exhaust normal investigative procedures before making the application; and (3) the affidavit was impeached and discredited by testimony taken at the hearing on the motion to suppress. At the conclusion of the hearings on the motion the district judge found that the affidavit had not been impeached or discredited and that its allegations constituted probable cause. The court found further that the interception of wire communications was the only investigative procedure likely to succeed.

### A. *Probable Cause*

■ The Cody affidavit must be read and interpreted in a commonsense and realistic fashion. If the apparent facts set out were such that a reasonably discreet and prudent man would be led to believe that Jackson was using the telephone No. 582–9265 in buying and selling narcotics and in conspiring to do so, that was enough. Dumbra v. United States, 268 U.S. 435, 45 S.Ct. 546, 69 L. Ed. 1032 (1925); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82, cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113, rehearing denied, 358 U.S. 923, 79 S.Ct. 292, 3 L.Ed.2d 242 (1958). We think the affidavit met this test. The reliable informant Lewis knew Jackson to be one of the largest narcotics wholesalers in the Washington area. On two occasions he purchased a substantial quantity of unusually pure heroin from Jackson. In the course of these dealings he learned that 582–9265 was apparently the secure headquarters number of the Jackson narcotics enterprise. This fact appeared from the following circumstances: (1) when on June 17 Lewis called Jackson for the first time at 399–3695 the answerer reported that Jackson was at the "582 number" but that number could be given out only with Jackson's permission; (2) when Lewis called the 582 number the answerer gave him the number of a barbershop where Jackson could be reached; (3) on June 23, when Lewis called the 582 number, he was told that Jackson was regularly there after 2:00 P.M. to receive calls. In addition, there were the many calls from the 582 number to Laredo, Texas, the main point on the Texas border for the smuggling of narcotics from Mexico into the United States.

### B. *Use of Normal Investigative Techniques*

■ As required by the statute, 18 U.S.C. § 2518(3)(c), District Judge Jones determined on the basis of the allegations submitted to him that normal investigative procedures had been tried and had failed to penetrate the Jackson enterprise, or reasonably appeared to be unlikely to succeed if tried. This determination was sustained by Judge Robinson after hearing the motion to suppress. We agree.

We consider and apply section 2518(3)(c) in light of the discussion of that provision in S.Rep.No.1097, 90th Cong., 2d Sess. 101, U.S.Code Cong. & Admin.News 1968, pp. 2112, 2190 (1968):

> This requirement is patterned after traditional search warrant practice and present English procedure in the issuance of warrants to wiretap by the Home Secretary. [Citation omitted.] The judgment would involve a consideration of all the facts and circumstances. Normal investigative

procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. [Citations omitted.] *What the provision envisions is that the showing be tested in a practical and commonsense fashion.* [Emphasis added.]

Considering the matter in a practical and commonsense fashion we find that although the informant had made two purchases of drugs from Jackson it was reasonable to believe that these transactions were only minor items in Jackson's enterprise, and that the exposure of his entire operation required different and more sophisticated techniques. Certainly it was clear that surveillance techniques and infiltration would be frustrated by Jackson's extreme caution.

### C. *Impeachment of the Affidavit in Support of the Application*

■ At the hearing on the motion to suppress the appellants attempted to demonstrate various inaccuracies, discrepancies or omissions in the Cody affidavit, which, according to the appellants, destroyed its validity as a statement of probable cause. Thus it was claimed that the telephone listed to Amelia Rendon in Laredo, Texas, had been disconnected before the order authorizing the wiretap was signed, and that in any event the Amelia Rendon who was the subscriber was not the "fat Amelia" who was a courier of narcotics. The appellants challenged Cody's statement that the current toll records at 582–9265 were not available. In summary, the appellants contended that Cody's investigation was cursory and that he relied upon hearsay. As we have indicated, Judge Robinson concluded that the averments of the affidavit had "not been impeached or discredited [so] as to destroy proba-

ble cause for the issuance of the wiretap order . . . . " (Mot. Tr. 2641).

In our opinion the alleged inaccuracies or omissions in the Cody affidavit were not fatal to the showing of probable cause. In reaching this conclusion we assume without deciding that a court may examine the underlying evidence when an affidavit establishes probable cause on its face. *See* Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *cf.* Kenney v. United States, 81 U.S.App.D.C. 259, 157 F.2d 442 (1946); United States v. Gianaris, 25 F.R.D. 194 (D.D.C.1960). *But see* United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973).

### D. *Department of Justice Authorization*

■ The applications for authority to intercept wire communications, upon which Judge Jones acted, were filed by Assistant United States Attorney Harold Sullivan and represented that they were "authorized by the Assistant Attorney General for the Criminal Division of the Department of Justice [Will Wilson], who has been specially designated by the Attorney General of the United States to exercise the powers conferred on him by Section 2516 of Title 18, United States Code."

After their appeals were perfected the appellants filed motions in this court requesting a remand, to examine the manner in which officials of the Department of Justice authorized the wire interception applications. The motions were inspired by the decision of the Circuit Court of Appeals for the Fifth Circuit in United States v. Robinson, 468 F.2d 189, decided Jan. 12, 1972; for subsequent developments in the case see 472 F.2d 973 (5th Cir. 1973) (*en banc*), and 359 F.Supp. 52 (S.D.Fla.1973). In the *Robinson* case the court held invalid an interception application that was not approved by the Attorney General or by an Assistant Attorney General, but rather by executive assistants or deputies of these officials. The court held that this procedure failed to comply with the re-

quirements of 18 U.S.C. § 2516(1) which provides in part:

The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications . . . .

*See also* United States v. Mantello, 156 U.S.App.D.C. 2, 478 F.2d 671 (1973), petition for cert. filed, 42 U.S.L.W. 3022 (Apr. 30, 1973).

This court denied appellants' motions to remand, without prejudice to the submission of appropriate motions in the District Court pursuant to Fed.R.Crim. P. 33. Motions for a new trial were thereafter filed in the District Court and, after hearing, were denied by the trial judge.

At the hearing on the motions for a new trial the evidence, by way of affidavits, disclosed that Attorney General John N. Mitchell sent to Assistant Attorney General Will Wilson a memorandum captioned "SUBJECT: *Interception Order Authorization*" and referring to Mr. Wilson's "recommendation that authorization be given . . . to make application for an interception order under 18 U.S.C. § 2518, permitting the interception of wire communications to and from telephone number 582–9265 . . . ." The memorandum concluded "you are hereby specially designated to authorize Harold Sullivan to make the above described application." The memorandum was initialed by Mr. Mitchell. Similar memoranda were sent with respect to the applications for an extension of the wiretap on 582–9265 and for authority to intercept communications on 399–3695. Mr. Mitchell's affidavit stated that his "memoranda of approval . . . constituted notification to the Assistant Attorney General of the Criminal Division that the discretionary action of approving each of the requests to

make application to the court for an interception order had been taken by me." The affidavit of Henry Petersen, Deputy Assistant Attorney General in the Criminal Division, stated that having received the approval of the Attorney General, he signed Will Wilson's name to the letter informing Assistant United States Attorney Harold Sullivan that he was authorized to present the application to the court. Mr. Wilson did not examine any of the files but had authorized Mr. Petersen to sign his name to such a letter of authorization in every instance in which the request had been favorably acted upon in the Office of the Attorney General.

The District Court found that Attorney General Mitchell "personally approved the requests for authority to apply for the interception orders in this case." The court then "considered the requirements of 18 United States Code, Section 2518(1)(a) that the application for an order to intercept wire or oral communications shall state the applicant's authority to make such application and the identity of the officer authorizing the application" and the court found that "under the facts of this case" it was immaterial that Mr. Mitchell, and not Mr. Wilson, as alleged, was the authorizing officer. Accordingly the motions for a new trial were denied.

We agree with the district judge. He was plainly correct in his finding that the Attorney General personally approved the requests to make applications to the court for interception orders; and this personal authorization of the Attorney General complied with the requirements of 18 U.S.C. § 2516(1). That the applications to the court erroneously stated that they were authorized by Mr. Wilson rather than by the Attorney General was an immaterial variance. Once the Attorney General personally approved the request, the actions of his subordinates were essentially ministerial; the letter purportedly signed by Mr. Wilson was "but an act of transmittal without legal consequence to the authorization itself." United States v. Askins,

351 F.Supp. 408, 412 (D.Md.1972); United States v. Cafero, 473 F.2d 489 (3d Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3018 (Mar. 26, 1973); United States v. Becker, 461 F.2d 230 (2d Cir. 1972), petition for cert. filed, 42 U.S.L.W. 3016 (July 28, 1972); United States v. Pisacano, 459 F.2d 259 (2d Cir. 1972), petition for cert. filed, 42 U.S.L.W. 3016 (Apr. 8, 1972); United States v. Bobo, 477 F.2d 974 (4th Cir. 1973), petition for cert. filed sub nom. United States v. Gray, 42 U.S.L.W. 3167 (Aug. 2, 1973); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Ceraso, 467 F.2d 647 (3d Cir. 1972); United States v. Mainello, 345 F.Supp. 863 (E.D.N.Y.1972). The record clearly fixed responsibility for the authorizations upon the Attorney General and thus fulfilled the purpose of 18 U.S.C. § 2518(1)(a).[4]

## III. COMPLIANCE WITH THE COURT ORDER—MINIMIZATION

As required by 18 U.S.C. § 2518(5), each of the three wiretap orders contained the proviso that

> this authorization to intercept wire communications . . . shall be conducted in such a way as to minimize the interception of communications that are not otherwise subject to interception . . . .

It is undisputed that the government recorded every conversation during the period of the wiretaps. The appellants argue that in so doing the government violated the minimization condition of the court order. In support of this contention at a suppression hearing in the District Court the appellants challenged 11 calls and in their briefs to this court they list 184 "extremely personal" calls. The government had intercepted approximately five thousand calls.

 The congressional reports accompanying the wiretap statute and

decisions interpreting 18 U.S.C. § 2518(5) make it clear that the minimization standard, like the standards traditionally applied to the determination of probable cause, is one of reasonableness which must be ascertained from the facts of a given case. "What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance." S.Rep. No. 1097, 90th Cong., 2d Sess. 101, U.S. Code Cong. & Admin.News 1968, p. 2190 (1968). The minimization requirement is satisfied if "on the whole the agents have shown a high regard for the right of privacy and have done all they *reasonably* could to avoid unnecessary intrusion." United States v. Tortorello, 480 F.2d 764, 784 (2d Cir. 1973), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L. Ed.2d 86 (1973). [Emphasis added.] Therefore, interception of virtually all conversations may be found violative of the minimization requirement in a particular factual setting, see United States v. King, 335 F.Supp. 523 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3018 (Mar. 29, 1973), but be justified in other circumstances, see United States v. Bynum, 360 F.Supp. 400 (S.D.N.Y.), aff'd, 485 F.2d 490 (2d Cir. 1973).

 The question of reasonableness in wiretapping presents difficulties not found when the subject of a seizure is tangible property:

> What is "reasonable," "practicable," or "feasible" depends upon the facts and circumstances in each case. [Citation omitted.] It is certainly unreasonable and goes beyond the limits of practicability or feasibility in every case to give a seizing officer what the *Berger* [Berger v. State of New York, 87 S.Ct. 1873, 18 L.Ed.2d 1040] court characterized as a "roving commission to 'seize' any and all conversations." 388 U.S. at 59, 87 S.Ct. at 1883. But

---

4. Section 2518(1)(a) provides: "Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;"

it is not unreasonable to recognize that it is much easier to describe with particularity in a warrant the nature and contents of a physical object than a conversation which has not yet been heard. In the former case the law enforcement officer can by sight and touch generally determine before he takes the item into his custody whether it is something which he is authorized to seize by the warrant while in the latter case he can generally determine with exactness whether the conversation is authorized to be seized by the warrant only when he has already taken it into custody by having heard it in its entirety.

United States v. Focarile, 340 F.Supp. 1033, 1047 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973). With this perspective it becomes possible to identify the factors which determine the degree of minimization required in a given case.

1. *Scope of the Criminal Enterprise Under Investigation.* What the Senate noted with regard to the duration of a wiretap is pertinent to the minimization issue.

> Where it is necessary to obtain coverage to only one meeting, the order should not authorize additional surveillance. [Citation omitted.] Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately longer surveillance . . . .

S.Rep.No.1097, 90th Cong., 2d Sess. 101, U.S.Code Cong. & Admin.News 1968, p. 2190 (1968). Where the criminal enterprise under investigation is a large-scale conspiracy with many participants, it may be necessary for the government to monitor more conversations with greater intensity than when the investigation is more limited. For example, some so-phisticated narcotics conspiracies closely resemble advanced commercial enterprises with production and distribution networks, collection personnel, internal security forces, and so forth. Identification of the contours of the conspiracy and the participants may be the government's principal objective.[5] *Compare* United States v. Cox, 462 F.2d 1293 (8th Cir. 1972) (continuous tap found not to violate minimization requirement where the object of the investigation was an organized criminal conspiracy of large proportions) with United States v. King, 335 F.Supp. 523 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), petition for cert. filed, 42 U.S.L. W. 3018 (Mar. 29, 1973) (continuous tap found to violate the minimization requirement where the court order limited the interception to investigation of a single narcotics shipment).

Additional characteristics of a criminal enterprise may affect the level of minimization possible. Where the members of a conspiracy act with great circumspection, agents may be justified in monitoring a significant part, or perhaps all, of a conversation in order to be sure that it is indeed innocent. A number of reported cases have noted the use of codes within narcotics conspiracies so that superficially innocent conversations are actually highly relevant to the investigation. *See* United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Sisca, 361 F.Supp. 735 (S.D. N.Y.1973); United States v. Focarile, 340 F.Supp. 1033 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F. 2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973). Another technique often found is the use of guarded language or the deliberate discussion of irrelevant matters during the early moments of a conversation so that, if the conversations are being monitored, agents, assuming the call to be innocent, will cease the interception. *See* United States v. By-

---

5. Ultimately, fifty-five persons were charged in seven separate indictments as members of the Jackson conspiracy.

num, 360 F.Supp. 400, 412–413 (S.D. N.Y.), aff'd, 485 F.2d 490 (2d Cir. 1973).

True, if this thesis is taken to the extreme, the minimization requirement could be emasculated. The answer, of course, is that it will not be taken to an extreme if the reviewing standard is one of reasonableness and the factual setting of each case is examined carefully.

2. *Location and Operation of the Subject Telephone.* In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967), the Supreme Court held that the fourth amendment protects a person's reasonable expectation of privacy. As Justice Harlan noted in concurrence, such an expectation must "be one that society is prepared to recognize as 'reasonable.' " 389 U.S. at 361, 88 S. Ct. at 516. In wiretap cases decided both before and after enactment of the wiretap statute, courts have implicitly, if not explicitly, applied that standard in evaluating the propriety of government intrusion upon a citizen's privacy. Where the probability is high that persons not under investigation will be using the tapped telephone or that the content of the calls will not pertain to the subject matter of the investigation, the government must adopt procedures to limit the interception of those kinds of calls. Thus it is not surprising that statutory or constitutional violations are most often found when home or legitimate business telephones are tapped, for the citizen's expectation of privacy in such surroundings is high. *See* United States v. LaGorga, 336 F.Supp. 190 (W. D.Pa.1971) (minimization requirement violated by tap of home telephone when many of the intercepted calls were "innocent"); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (constitutional violation found in continuous tap of legitimate business telephone). Where, by contrast, a telephone is used exclusively to conduct illegal business and is located in a place which serves no residential or business purpose in the sense in which those terms are ordinarily used, then the users of that telephone do not have the expec-

tation of privacy which society accepts and less stringent minimization standards are both reasonable and permitted by Title III. *See* United States v. Bynum, 360 F.Supp. 400 (S.D.N.Y.), aff'd, 485 F.2d 490 (1973) (apartment at which telephone was located was used almost exclusively for criminal activity).

3. *Government Expectation of the Content of the Calls.* In order to obtain wiretap authorization, the government must show to the satisfaction of a judicial officer that there is probable cause to believe that a given telephone will be used for one of the offenses enumerated in the statute, 18 U.S.C. § 2518(3)(a), (b). If at the time of the initiation of the wiretap the government knows those persons who are suspected of the criminal offense, it can tailor its minimization efforts to avoid monitoring incoming or outgoing calls involving other persons; similarly, if the government knows during what time of the day the telephone will be used for criminal activity, it can avoid intercepting calls at other times. These considerations affect the initial minimization tactics employed by the government, but agents may expand or contract their interception policy as the wiretap continues:

> Probable cause must exist as of the time of the intrusion, and the results of the investigation—which naturally informs the hindsight analysis of judges and lawyers—are not to be considered. With wiretaps, however, the degree of probable cause existing during the course of an investigation may fluctuate, since the growing amalgam of information received during the tap more sharply defines the skeletal data, inferences and sophisticated suspicions with which the investigation began.

United States v. Bynum, 360 F.Supp. at 404.

Thus, judicial analysis of the minimization requirement must take note of the ever-changing character of the investigation. If the fruits of the tap in its early stages reveal a pattern of crim-

inal conduct unknown to the government at the time of the initiation of the tap, then an expanded policy of interception (within the confines of the court order) may be justified. *See* United States v. Focarile, 340 F.Supp. 1033, 1047–1050 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973). In the *Focarile* case the court found that there had been no violation of the minimization requirement even though government agents had not carried out a minimization policy until the tap had existed for almost two weeks.

Although total interception for 12 to 13 days may well be unreasonable under ordinary circumstances to establish a pattern [of personal calls], it does not seem to the court unreasonable here where there was an alleged narcotics conspiracy involving an unknown number of persons and where it was extremely difficult, if not impossible, to determine which calls were "innocent" in advance of obtaining a reliable pattern.

340 F.Supp. at 1050.

4. *Judicial Supervision by the Authorizing Judge.* In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967), the Supreme Court found a violation of the fourth amendment even though the government argued that the electronic surveillance undertaken was so narrowly circumscribed that it could have been authorized in advance. The Court held that bypassing a neutral predetermination by a judicial officer would circumvent "the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification . . . ." 389 U.S. at 358, 88 S.Ct. at 515, *quoting* Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The most striking feature of Title III is its reliance upon a judicial officer to supervise wiretap operations. "Close scrutiny by a federal or state judge during all phases of the intercept,

from the authorization through reporting and inventory, enhances the protection of individual rights . . . ." United States v. Bynum, 360 F.Supp. at 410. Once a judge has authorized a wiretap, he may continue supervising the implementation and operation of the tap by requiring reports from government agents. 18 U.S.C. § 2518(6). When a judge requires such reports at regular intervals, reviews the progress as it is related to him, and closely supervises the interception, "the rights of affected individuals are most likely to be safeguarded." United States v. Bynum, 360 F.Supp. at 410.

When the circumstances of the case under review are considered in light of the above factors, it becomes clear that the authorizing judge and the government agents could not have "formulate[d] any detailed screening instructions which could effectively minimize licit telephone interception." United States v. Bynum, 485 F.2d at 501. On the basis of the facts known to the government at the initiation of the tap (and contained in the Cody affidavit), it was clear that Jackson was involved in a narcotics conspiracy of great size and sophistication. The purchases of unusually pure heroin negotiated by Lewis indicated that Jackson was close to importers and high in the distribution chain. Jackson's extreme circumspection, which made it impossible for the government to penetrate his enterprise with conventional enforcement techniques, indicated that he was streetwise, and Lewis indicated that Jackson was known as one of the largest narcotics wholesalers in the city.

The June 19 and June 24 heroin purchases, negotiated through calls placed to 582–9265, gave the government every reason to believe that the residence and telephone therein served as an answering service. First, there had been the circumspection surrounding the disclosure of the 582 number to Lewis. Second, there had been the persons at the 582 number who had been able to get messages to Jackson. Third, although

not mentioned in the affidavit, Jackson himself had told Lewis to call him at the 582 number on June 19 to arrange the drug delivery. Finally, there was the June 23 statement by a person answering the 582 telephone that Jackson was there regularly in the afternoon. These factors justified the government's belief that the telephone was used largely for illegal activities and, under the theory adopted in the *Focarile* case, authorized an early period of constant monitoring in order to determine the pattern of illegal usage.

■ Certainly once the tap was installed the government was justified in continuing to intercept every conversation. It became clear that the 582 number was used almost exclusively to conduct illegal business. The people taking orders frequently admonished purchasers to state their business quickly so that the telephone would not be tied up. Callers were told, "This is a business 'phone." (Tel. Tr. 2188). Jackson once said, "Now lay off the 'phone, 'cause I've got some calls comin'". (Tel. Tr. 5547). "I holdin' the line up and people wants to pay money . . . ." (Tel. Tr. 5878–79). When a non-business call came in, the caller was told, "Alrighty, well I am on somebody's 'phone, this is a business 'phone so look here, I call you when I get home." (Tel. Tr. 12,742). Calls came in during all hours of the day and night at the rate of one every ten minutes. The telephone was manned in shifts, with "employees" often near exhaustion. The apartment in which the telephones were located served no residential function. Although statistics prepared after the fact cannot control— the adequacy of minimization depends upon what appeared to government agents at the time—statistics reveal that seventy percent of the calls were related to narcotics transactions, while only twelve percent could positively be determined to involve neither narcotics nor other criminality. Because many persons involved were either friends or relatives, many conversations containing incriminating statements—some of them

in cryptic or coded terms—also contained some personal conversations.

In accordance with the terms of the wiretap order, the government submitted written and oral reports to Judge Jones. Written reports, which have been examined by this court, were submitted on July 14, July 28, August 7, and August 13 with respect to the July 11–August 19 tap on the 582 number. A number of the reports prepared by the agent-in-charge (and submitted to the Assistant United States Attorney) were also given to Judge Jones at these times. While the reports do principally deal with aggregate statistics, they also highlight important developments in the identification of participants in the conspiracy, and a fair reading indicates that the authorizing judge was aware that the government was intercepting every telephone call. The record also contains a memorandum from Judge Jones indicating that the Assistant United States Attorney made oral reports of the progress of the investigation on July 14, 18, 23, and 28, and August 1 and 13, 1969. Fewer oral and written reports were filed with regard to the tap on the 399 number which was in operation only between August 1 and 19; but it is clear that Judge Jones was aware of the progress of the government investigation, understood the scope of the interception, and approved the government conduct.

In support of their argument that the recorded interceptions were in impermissible intrusion into their privacy, the appellants refer us to a number of conversations which they characterize as "private". We think their illustrations contradict their argument, for although the conversations frequently contain chaff they are also laden with evidentiary wheat. For example, the appellants refer to one conversation which they summarize as follows: "On July 16 at 5:32 a. m. a man and woman talk about personal matters for several hours." When we examine the conversation, which was played in substantial measure by the government at trial, we find that it occurred between Jackson and his confi-

dante and co-defendant Mary Davis. It began at 5:32 A.M. and lasted until 7:40 A.M. During the conversation reference was made to "Carlos", later identified as the co-defendant Paladino, whom Jackson regularly met at the Davis house. Jackson discussed the efforts of the police to keep him under surveillance, the techniques the police employed, and the steps he was taking to avoid detection. Jackson also talked at length of the economics of the drug traffic, the problems caused by people "sniffin' and snortin' and tastin'" his drugs and the problem of getting large customers to buy both heroin and cocaine. He spoke of the difficulty of obtaining good help and of keeping the good will of his suppliers. Davis accused him of paying less attention to her when he met Carlos and started making "big money"; to which Jackson rejoined that the growing responsibility of dealing with "bigger people" required his increased attention.

The appellants also point to a conversation on July 17 at 5:13 A.M., when "a woman and her brother-in-law discuss the hardships of her life for over 10 minutes." This was a conversation between Lester Jackson, the brother of Lawrence Jackson, and a woman. Lester told the woman that earlier in the day police had been in the neighborhood, apparently engaged in surveillance, and that Lawrence Jackson was attempting to determine whether they were still there. He said that Lawrence was often exhausted by his efforts in running a successful narcotics business because he refused to trust others and made most of the "moves" himself; that no one in the business could keep awake longer than Lawrence who pushed himself to the limit of his endurance in pursuit of business. Lester Jackson added that he intended to leave the headquarters as soon as he finished counting the money. Five hours later he called the woman and told her he had been delayed the previous evening by "rollers" that showed up. He said he had been receiving money "so fast I can't get no break, every time I look around somebody else

lookin' an' somebody else bring some money." He asked whether the woman put the last batch of money in the proper spot and said he had another bag of money as "big as that one". Appellants characterize this conversation as one in which a "man talked to his wife and baby daughter".

The telephones in this case were used almost exclusively to conduct illegal transactions; any personal conversations were mere specks in the torrent of conspiratorial communications. The appellants were not in a position to insist that their few legitimate personal remarks must be sieved out from the great volume of their unlawful conversations.

## IV. THE CASE OF APPELLANT BROOKS

The appellant Brooks contends that the evidence does not support his conviction of conspiracy. His argument must be rejected.

For five years before his arrest Brooks had been a member of the Narcotics Squad of the Metropolitan Police Department, and in that capacity he was familiar with the operations of the appellant Jackson. The evidence disclosed that he made many telephone calls to Jackson and the other conspirators on 582–9265 and 399–3695; some sixty recordings of the intercepted calls were introduced in evidence. There were also calls from 582–9265 to Brooks' residence in Maryland. In addition, federal agents testified concerning their observations of Brooks. For example, there was testimony that on one occasion agents gave Brooks false information that they planned to have an informant purchase heroin from Jackson at a certain time and place. Thirteen minutes later Brooks called Jackson's headquarters to warn him of the impending arrest. Later in the day Brooks telephoned Jackson and told him "the Feds are going to try to get you today". He also gave Jackson the name of the informant who was supposed to have made the purchase of narcotics. Finally, there was evidence which justified the

jury in finding that Jackson was giving Brooks money in return for the information he received from Brooks.

Brooks summarizes his argument as follows:

> The evidence against Brooks, which because of its character was also evidence against Jackson, showed at most that the two of them were engaged in a bribery scheme. Stretched to its furthest possible limits this evidence showed only that Brooks a narcotics officer was giving Jackson information that he obtained or learned in his work that was useful to Jackson, a narcotics trafficker. There was absolutely no evidence that Brooks was in anyway [sic] involved in drug dealings or transactions. There was no evidence that he had any contact or knowledge of the defendants Tantillo, Paladino or Verderosa, or James. There was no evidence that the agreement between these persons contemplated, included or embraced the Jackson-Brooks dealings.
>
> * * * * * *
>
> In making this argument, it is conceded that the evidence supports the inferences that Brooks knew that Jackson was dealing in both heroin and cocaine, and that as a narcotics officer of broad experience, Brooks knew that Jackson was getting his drugs from someone else, and that as to the heroin Jackson was selling, Brooks knew that it had been imported into the United States by someone, somewhere, contrary to law.

(Brooks' Brief at 25–26, 33–34).

We think the appellant's argument answers itself. The evidence showed that Brooks played a vital part in the conspiracy by protecting Jackson and his enterprise from interference by the police. He did this with full knowledge of the nature of the unlawful enterprise, even though he might not have known the identity of all the participants. This was enough to make him a party to the conspiracy. The government was not required to show that Brooks knew

Tantillo, Paladino, Verderosa, or James; a conspirator need not know the identity of all other conspirators or the particular roles they play in the unlawful enterprise. United States v. Bynum, 485 F. 2d 490, 495–497 (2d Cir. 1973); United States v. Agueci, 310 F.2d 817, 826–828 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); United States v. Cole, 365 F.2d 57 (7th Cir. 1966), cert. denied, 385 U.S. 1024, 1027, 1032, 87 S.Ct. 741, 764, 17 L.Ed.2d 672, 674, 679, rehearing denied, 386 U.S. 951, 87 S.Ct. 971, 979, 17 L. Ed.2d 879 (1967); United States v. Rich, 262 F.2d 415, 418 (2d Cir. 1959).

## V. ADDITIONAL ARGUMENTS BY TANTILLO AND VERDEROSA

### A. *Voice Identification*

At trial narcotics Agent Devine listened to a number of recorded telephone conversations and was able to identify the voices of Paladino and appellants Verderosa and Tantillo. The appellants argue that the admission of Devine's testimony violated their rights to counsel and due process.

Before trial Agent Devine had been present at two post-indictment meetings when a government informant, Ralph Caputo, listened to the tapes and identified the voices of those participating. On one occasion both Devine and Caputo wore earphones, and when Caputo identified the voices for other agents at the meeting, Devine did not hear him (except on a few occasions when Devine had removed the earphones). At the second meeting neither Devine nor Caputo wore earphones, and Devine was able to hear both the tapes and Caputo's identification of voices. At trial the government called Caputo. Out of the presence of the jury, he testified that he knew the voices of Verderosa, Tantillo, and Paladino quite well because he had dealt in narcotics with them on numerous occasions. The appellants objected that they could not effectively cross-examine Caputo because to do so would

waive their rights against self-incrimination regarding the prior narcotics dealings. The District Court ruled Caputo's proffered testimony inadmissible, and it was in this context that the government proffered Agent Devine. Devine had heard the voices of the appellants many times at a New York restaurant and bar where he had conducted at least seventy hours of close surveillance of the appellants, and he testified that he recognized their voices in the recordings before he heard Caputo's identifications.

In light of United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), we reject the argument that counsel should have been present at the pretrial meetings when Devine listened to the tapes. The appellants' due process attack is also unfounded. Even assuming that the Caputo identification in Devine's presence was suggestive, there was clearly an independent basis for Devine's in-court identification of the voices. Devine's surveillance of appellants, when he observed and listened to them at close range over a substantial period of time, established by clear and convincing evidence that the in-court identifications were based upon factors other than Caputo's statements. United States v. Wade, 388 U.S. 218, 240, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967).

B. *Validity of Two Conspiracy Convictions*

 Appellants Tantillo and Verderosa were convicted on count 1 of the indictment charging conspiracy under 26 U.S.C. §§ 4705(a), 7237(b) and on count 2 of the indictment charging conspiracy under 21 U.S.C. § 174. They contend that Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), precludes their conviction and sentencing on both counts because, although the object of the conspiracy may have been the violation of two different statutes, there was proof of but one conspiracy.

In the *Braverman* case, the defendants were convicted under section 37 of the Criminal Code of conspiracy to violate numerous provisions of the Internal Revenue Code. Each count of the multi-count indictment referred to a separate Revenue Code provision, and the defendants received consecutive sentences on each count for conspiracy to violate each provision of the Revenue Code. The conspiracy itself was proscribed under the all-encompassing federal conspiracy statute, the predecessor of 18 U.S.C. § 371. The Court reversed:

> Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. [Citations omitted.] The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, § 37 of the Criminal Code. For such a violation only the single penalty prescribed by the statute can be imposed.

317 U.S. at 54, 63 S.Ct. at 102.

In the present case the defendants were convicted of the violation of two separate and distinct conspiracy statutes. The government argues that this distinguishes the *Braverman* case, and the Supreme Court has so held. In American Tobacco Co. v. United States, 328 U.S. 781, 787–788, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the Supreme Court addressed the argument that separate convictions for conspiring to restrain trade and conspiring to monopolize trade, in violation of two sections of the Sherman Act "amount to double jeopardy, or to a multiplicity of punishment . . . ." The Court stated:

> On the authority of the *Braverman* case, petitioners claim that there is but one conspiracy, namely, a conspiracy to fix prices. In contrast to the single conspiracy described in that case in separate counts, all charged under the general conspiracy statute, § 37, Criminal Code, 35 Stat. 1096, 18 U.S.C. § 88, we have here separate statutory offenses, one a conspiracy in restraint of trade . . . and

the other a conspiracy to monoplize . . . . One is made criminal by § 1 [of the Sherman Act] and the other by § 2 of the Sherman Act.

328 U.S. at 788, 66 S.Ct. at 1128. This interpretation of the meaning of the *Braverman* decision is consistent with the view of the commentators. *See* Annot., 87 L.Ed. 29, 37–39 (1943); 1 Anderson, Wharton's Criminal Law and Procedure § 83, at 180 (1957). Where, as in this case, two specific conspiracy statutes are involved, a defendant may properly be convicted under both. Accordingly we reject the contention of Tantillo and Verderosa.[6]

### C. *Rulings On Evidence*

Tantillo and Verderosa challenge the admission in evidence of a three-party telephone conversation between Jackson, a "collection agent" of the enterprise named Rudy, and a delinquent purchaser named Buster. In the course of the conversation, to stimulate Buster to pay for the drugs he had received, Jackson threatened him with death or serious injury. Jackson also complained that Buster's failure to pay was jeopardizing Jackson's life because when "them Guineas get to shooting, they don't shoot at you. . . . 'Cause I'm da one dats takin all da weight." (Tel. Tr. 377). The appellants claim that these statements by Jackson were not made in furtherance of the conspiracy, and prejudiced them by characterizing them as potential murderers. We think however that the statements were admissible. A criminal conspiracy continues until the objects for which it was formed have been accomplished. Since one object of this conspiracy was illicit gain—the collection of money in exchange for drugs—it embraced the means ordinarily employed to accomplish that intended result. *Cf.* McDonald v. United States, 89 F.2d 128, 133–134 (8th Cir.), cert. denied, 301 U. S. 697, 57 S.Ct. 925, 81 L.Ed. 1352, rehearing denied, 302 U.S. 773, 58 S.Ct. 4, 82 L.Ed. 599 (1937), rehearing denied, 325 U.S. 892, 65 S.Ct. 1181, 89 L.Ed. 2004, (1944). A fair inference, grounded in common sense, was that the means of collection contemplated and sometimes used by the conspirators would not be those employed in normal commercial transactions. As the Second Circuit observed with respect to an analogous contention in United States v. Bynum, 485 F.2d 490, 499 (2d Cir. 1973): "We are not dealing with minor league addicted street pushers but with well-financed brazen professionals engaged in a large-scale criminal undertaking in which corruption and violence are endemic."[7]

---

6. Tantillo and Verderosa also challenge the conviction for violation of 21 U.S.C. § 174 on the theory that no heroin was introduced into evidence to support the requisite finding of possession. The only heroin introduced at trial had been purchased by informer Lewis, and the court had instructed the jury that there was no evidence that Tantillo and Verderosa had constructively possessed that particular heroin. (Tr. 5743). Appellants misconceive the nature of a conspiracy charge, which need not include proof of commission of the substantive violation. There was substantial evidence introduced at trial, including intercepted conversations, from which the jury could have concluded that Tantillo and Verderosa were dealing in heroin. We agree with the Second Circuit which held that

"no proof of actual dealings in narcotics is required to establish conspiracy to violate the narcotics laws and that when such proof is required, as in the case of a substantive count or in order to give rise to the statutory inference from possession, 'just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence' . . . . "

United States v. Nuccio, 373 F.2d 168, 174 n.4 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623, rehearing denied, 389 U.S. 889, 88 S.Ct. 16, 19 L.Ed.2d 199 (1967).

7. Tantillo and Verderosa also object to the evidence concerning the corruption of Brooks. Enough has been said, we think, to demonstrate that the activities of Brooks were part and parcel of the conspiracy and plainly within the contemplation of Tantillo and Verderosa as conspirators. *See* Part IV, *supra*.

## VI. TANTILLO'S CHALLENGE TO THE § 4704(a) CONVICTION

 Count 9 of the indictment charged Tantillo jointly with Verderosa and Paladino with a violation of 26 U.S. C. § 4704(a). The count was based upon cocaine seized in the late afternoon of August 18, 1969 in apartment 723 of the Cambridge Apartments, 1221 Massachusetts Avenue, N.W., in Washington. Tantillo contends that there was no evidence to justify a finding beyond a reasonable doubt that he possessed the cocaine, either actually or constructively. Analysis of the evidence impels us to a contrary conclusion.

At trial the parties agreed on a single instruction outlining the legal concepts of possession. Included in the instruction and given to the jury was the following charge on constructive possession:

. . . A person who, although not in actual possession, knowingly has the power and the intent at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it. Such constructive possession of a narcotic drug may be found where a person has the power to control the disposition of the drug and to assure its delivery. Thus, a person who has a working relationship with or is otherwise exclusively associated with those who have physical custody of a narcotic drug so that he is without difficulty and, as a matter of course, able to assure production of the drug to a customer, may be found to have constructive possession of the narcotic drug.

However, a person who lacks such a working relationship or association sufficient to assure production of the drugs may not be found constructively to possess it even if he knows the person or persons possessing and trading in the narcotic drug. (Tr. 5741–42).[8]

Applying the test stated in the court's charge we think the evidence justified the jury in concluding that Tantillo possessed the cocaine found in apartment 723.

There was evidence from which the jury could reasonably infer that on July 28, 1969 Tantillo, Verderosa and Paladino came to Washington, established a base of operations at the Hotel America and made a delivery of narcotics to Jackson. A week later, on August 5, Tantillo and Verderosa went to the Cambridge Apartments and inquired about a one-bedroom apartment. Later that day Tantillo in the presence of Verderosa filled out a rental application for apartment 723. Using the fictitious name "DiCarlo", Tantillo represented to Mrs. Ann Vernon, the resident manager, that he was in Washington to open a bakery and Verderosa was his helper.

On August 11 Tantillo, Verderosa and Paladino again operated from the Hotel America while dealing in narcotics with Lawrence Jackson and Leon James. On that same day Tantillo and Verderosa returned to the Cambridge Apartments and Tantillo signed a one-year lease for apartment 723. Tantillo was given a set of keys to the apartment. Tantillo and Verderosa were in and out of the Cambridge that afternoon and were together at the apartment house on the following day.

On August 13 Tantillo introduced Paladino to Mrs. Vernon as "Mr. Rizzo", his brother-in-law. Tantillo told Mrs. Vernon he wanted her to meet Mr. Rizzo

---

8. *See* United States v. Baratta, 397 F.2d 215, 224 (2d Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968), rehearing denied, 393 U.S. 1045, 89 S.Ct. 613, 21 L. Ed.2d 597 (1969); United States v. Bethea, 143 U.S.App.D.C. 68, 70, 442 F.2d 790, 792 (1971); United States v. Davis, 461 F.2d 1026, 1035–1036 (3d Cir. 1972); United States v. Mendoza, 433 F.2d 891, 896 (5th Cir. 1970), cert. denied, 401 U.S. 943, 91 S. Ct. 953, 28 L.Ed.2d 225 (1971); Rodella v. United States, 286 F.2d 306 (9th Cir. 1960), cert. denied, 365 U.S. 889, 81 S.Ct. 1042, 6 L.Ed.2d 199 (1961); United States v. Jones, 308 F.2d 26, 30 (2d Cir. 1962).

because Mr. Rizzo "would be spending quite a bit of time here from New York".

There was evidence that on August 15 Paladino called Jackson and agreed to resupply Jackson with cocaine on Monday, August 18. On Monday morning Paladino arrived at National Airport by plane and proceeded to Union Station where he met Verderosa who was carrying the cocaine, wrapped in multi-colored paper. Verderosa then went by cab to the Cambridge Apartments where he left the cocaine in apartment 723, using Tantillo's keys to open the apartment. Verderosa and Paladino thereafter made several attempts to reach Jackson by telephone. Verderosa finally reached Jackson at the 582 number and they agreed to meet at Alabama Avenue, S. E., where Jackson was to pay Verderosa for the cocaine. At the meeting place Verderosa, Paladino and Jackson were arrested and agents recovered two keys which were dropped by Verderosa. The agents took the two keys to the Cambridge Apartments, compared them with the keys to apartment 723 which Mrs. Vernon produced, and found they were identical. Shortly thereafter the agents, using the two keys, and armed with a search warrant, entered the apartment. There they found a plastic bag containing 463.72 grams of 55.4% anhydrous cocaine. Also found was some crumpled multi-colored wrapping paper which was identified by an agent as the same kind of paper that was on the package Verderosa had been carrying that morning at Union Station.

While the agents were searching apartment 723 there was a knock on the door and when an agent opened it Tantillo and a young lady were standing in the doorway. Tantillo was then arrested and searched. In one of his pockets was a roll of bills totaling $2,210. Among his papers was one on which several telephone numbers were written, including the 582 number, the 399 number, and a number listed to the wife of Leon James.

When Tantillo entered the lobby of the Cambridge Apartments just before his arrest he tried to use the telephone at the switchboard to call his apartment; however, the switchboard was busy and Tantillo went up to the apartment unannounced.

From all this evidence we think the jury could reasonably conclude that Tantillo rented the apartment at the Cambridge as a base for his operations and as a place for the storage of narcotics pending their delivery. The evidence also justified the conclusion that Tantillo had given his keys to Verderosa, intending that the drugs consigned to Jackson be kept in the apartment until they were delivered. Tantillo was plainly the managing partner of the unlawful enterprise; his working relationship and association with Verderosa and Paladino were such that he obviously had dominion and control over the apartment and the drugs stored there, and was able to assure their production to the customer Jackson. This was enough to show that he had constructive possession of the drugs.

## VII. ADDITIONAL ARGUMENTS BY APPELLANT JAMES

### A. *Validity of the Search Warrant*

Pursuant to a search warrant issued August 17, 1969 agents searched James' apartment on Florida Avenue, N.W., and seized quantities of heroin and cocaine. The drugs thus seized provided the principal evidence upon which James was convicted of substantive narcotics offenses. He argues that the evidence should have been suppressed because the affidavit in support of the search warrant contained material errors; if those errors had not been made, he says, there would not have been probable cause for the issuance of the warrant.

The affidavit filed by Agent Cody set out facts and circumstances, including telephone conversations, from which it could reasonably be concluded that Tan-

tillo, Paladino and Verderosa (then known as Santarelli) in New York were the source of Jackson's supply of narcotics; and that when they made delivery of narcotics to him they came to Washington for that purpose. On the afternoon of August 11, 1969, according to the affidavit, agents observed Tantillo, Paladino and Verderosa in the Hotel America at 14th Street and Massachusetts Avenue in Washington. Verderosa left the hotel carrying a black vinyl bag. Following behind him were Tantillo and Paladino. Verderosa walked alone to a point on N Street near the hotel, where he got into a 1968 black-over-yellow Ford Thunderbird. Twenty-two minutes later the agents observed Leon James driving the Thunderbird in the vicinity of the hotel. In the car with James was Verderosa. The agents lost sight of James for about ten minutes and then saw him driving off alone. They followed him to 14th Street and Florida Avenue, N.W. where he parked and entered an apartment building at 1415 Florida Avenue. At this time he was carrying a plaid plastic bag "approximately large enough to hold a loaf of bread" and his actions were furtive. Consulting telephone company records the agents found that an unpublished telephone number was listed in the name of Leon James at 1415 Florida Avenue, Apartment 303.

The Cody affidavit also referred to five intercepted telephone communications which he believed concerned Leon James. These conversations were:

■. At 8:05 P.M. on August 8, 1969, "Leon" telephoned to Lawrence Jackson at 582–9265, asked for Jackson, and, on learning from "Wayne" that Jackson was elsewhere, left the telephone number CO5–3203, which number according to the records of the Chesapeake and Potomac Telephone Company is listed to Ontario Liquors, 1733 Columbia Road, N.W., Washington, D.C.

■. At 8:30 P.M. on August 8, 1969, Lawrence Jackson telephoned to 582–9265 and asked "Richard" for messages. When told that "Leon" had called, Jackson asked if that was "Leon James". Richard called to "Wayne" in the room and asked which "Leon" it was that had telephoned. "Wayne" stated that Jackson should call "Leon" at CO5–3203.

■. On August 8, 1969, at 10:22 P.M. "Leon" called . . . again and asked for Lawrence Jackson. "Leon" said he was waiting. A Lawrence Jackson associate was upset that Jackson had not called, "Leon", and said he would go up the street and tell Jackson that "Leon" was waiting.

■. At 4:05 A.M. on August 10, 1969, "Sissy Harold" telephoned Lawrence Jackson at 582–9265 and, during a long conversation, asked Jackson to finance him in a narcotics selling operation. Jackson refused, stating that "Leon James" (whom Jackson also refers to as "Old Man James") once loaned "Sissy Harold" money to start an operation and that James never received his money back. According to Jackson, "Leon James" had told him not to do business with "Sissy Harold."

■. On August 11, 1969, at 10:42 A.M., "Leon" called the headquarters of Lawrence Jackson. An associate of Jackson said that Jackson had left one-half hour ago. "Leon" then said "Have Lawrence come to my store. The man left some money for him."

Before trial, on the basis of further study, the government concluded and with commendable candor conceded that the Leon mentioned in calls Numbered 1, 3 and 5 was not the defendant Leon James. Seizing on this discrepancy the appellant James argues that the attribution of the calls to him was unreasonable and that in consequence probable cause to issue the search warrant did not exist. We disagree.

The existence of probable cause to support a warrant is to be determined from the perspective and knowledge of the agents and magistrate at the time it

was issued. Specifically, the question here is whether a reasonably discreet and prudent man, considering the facts and circumstances presented to Agent Cody and the magistrate, would have believed that James was engaged in illegal narcotics activity at 1415 Florida Avenue, Apartment 303. We think the facts and circumstances meet that standard.

Given the sequence in time in which the telephone calls occurred, together with the identification of Leon James by name in two of the calls, it was not unreasonable to conclude that the "Leon" referred to in all five instances was Leon James. Moreover, the three calls erroneously attributed to Leon James added little to the substance of the affidavit; at most they showed a relationship between Jackson and "Leon", a fact already established by the other two calls.

Taken as a whole, the Cody affidavit plainly established probable cause for the search of the James apartment. The vinyl bag carried by the known narcotics courier, the circumspect meeting in the car with an implicated trafficker, the disappearance of the courier minutes thereafter, the bread-sized bag carried by James as he left his parked car near his apartment, and his furtive conduct upon entering the building—these circumstances taken together reasonably established the probability that Verderosa gave Leon James a quantity of narcotics which he thereafter took to his apartment and secreted there.

## B. *The Count 12 Cocaine Conviction*

The jury convicted Leon James on count 12 of the indictment which charged that he violated 26 U.S.C. § 4704(a) by purchasing, dispensing or distributing two packages of cocaine not in or from the original stamped package. He contends that the evidence did not support this conviction.

The two packages of cocaine involved in count 12 were found by agents on August 18, 1969 during the search of the James apartment on Florida Avenue. Both packages of cocaine were found in a locked metal box in the dresser of the apartment. One of the packages was a glassine bag containing 2.656 grams of 6.77% anhydrous cocaine. The other package was wrapped in tinfoil and contained 1.716 grams of 6.87% anhydrous cocaine.

Also contained in the locked metal box along with the cocaine were the following:

a. a large double glassine bag containing a white powder which was determined to be 72.769 grams of 86.7 percent anhydrous heroin;

b. twelve empty glassine bags which are commonly used to package narcotics in quantities of less than an ounce.

c. 147 empty glassine bags which are commonly used to package narcotics in quantities of an ounce or more; and

d. assorted paraphernalia commonly used to cut or weigh narcotics, e. g., sifter, knife, tinfoil, spoons.

In the hall closet of the apartment agents found a suitcase containing a spoon and a bag. The bag contained a substance which turned out to be manitol, a diluent which can be used to cut drugs. Also recovered from the hall closet was a scale with calibrations from one-half ounce to sixteen ounces.

In one of the address books seized from the apartment was the following notation:

| | |
|---|---|
| 11 ½ Boy | |
| 1 ¼ '''' | |
| 1 OZ Girl | $930.00 |
| 4 '''' | 1500.00 |
| $300.00 | 570" |

Evidence showed that the terms "½ Boy," "¼ Boy," "1 OZ Girl," "¼ Girl," are terms used in the trafficking of narcotics and that the meanings of the terms are respectively: ½ ounce of heroin, ¼ ounce of heroin, 1 ounce of cocaine, and ¼ ounce of cocaine.

██ From the notebook entry the jury reasonably could have inferred that

appellant James purchased and dealt in substantial amounts of cocaine as well as heroin. From the cutting paraphernalia found in the apartment, the jury reasonably could have concluded that James used that paraphernalia to cut the cocaine and heroin he purchased, and that the two packages of cocaine found in the locked metal box along with the larger package of heroin had been prepared by James for street distribution. In particular this inference was reasonable with respect to the cocaine which was packaged in a glassine bag, identical with numerous other glassine bags found in the locked metal box. From this particular type of drug packaging and the circumstances which surrounded its possession, the jury reasonably could have inferred that the package of cocaine was intended solely for distribution and not for appellant James' personal use. *Cf.* Turner v. United States, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610, rehearing denied, 397 U.S. 958, 90 S.Ct. 939, 25 L.Ed.2d 144 (1970).

■ James does not claim that the evidence was insufficient to support his conviction on count 10 of the indictment. This count related to the heroin found in the locked metal box which also contained the cocaine. In light of all the circumstances we think it was a reasonable conclusion that the heroin and the cocaine were possessed by James for the same purpose, that each was a part of his stock in trade. Although the stock of *cocaine* happened to be low the jury could believe that it was still for sale.

■ The appellant James objects to the reference in the court's charge to the statutory inference created by the mere possession of a narcotic drug. True it is that in Turner v. United States, 396 U.S. 398, 423, 90 S.Ct. 642, 656, 24 L.Ed.2d 610, the Supreme Court held that "bare possession of cocaine is an insufficient predicate for concluding that [a defendant] was dispensing or distributing." In the case of James however the evidence showed much more than bare possession of cocaine. The in-

struction on the inference is therefore "beside the point, since even if invalid, it was harmless error; the jury must have believed the possession evidence which in itself established a distribution barred by the statute." Turner v. United States, 396 U.S. at 421, 90 S.Ct. at 655.

Having considered all the contentions of the appellants we conclude that the judgments must be and they are hereby

Affirmed.