### UNITED STATES of America

v.

### Joseph B. DAVIS, Appellant.

### No. 75–1374.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1975.

Decided April 6, 1977.

Michael Evan Jaffe, Washington, D.C., with whom Elisse B. Walter, Washington, D.C. (both appointed by this Court) was on the brief, for appellant.

John L. Kern, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James M. Hanny, and Stuart M. Gerson, Asst. U. S. Attys., Washington, D.C., at the time the brief was filed, were on the brief, for appellee.

Before BAZELON, Chief Judge, MR. JUSTICE CLARK,* Retired Associate Justice of the United States Supreme Court, and MacKINNON, Circuit Judges.

Opinion for the Court PER CURIAM.

Opinion filed by Chief Judge BAZELON, dissenting in part and concurring in part.

PER CURIAM.

Pursuant to a validly issued search warrant, the resulting search of an apartment occupied jointly by appellant and his two codefendants revealed a large quantity of different types of drugs and drug related paraphernalia. On the basis of this evidence, a jury found them guilty of three counts of possession of LSD and marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a) (1970), and possession of marijuana in the form of hashish, in violation of D.C.Code § 33–402 (1973), and not guilty of two other counts. Appellant was sentenced to a term of five years probation

pursuant to the Federal Youth Corrections Act, 18 U.S.C. § 5010(a). This appeal questions only the convictions of Davis.

Convictions on all three counts rest upon a factual determination that appellant Davis possessed the drugs involved. Two of the counts also included the jury's conclusion that such possession was with intent to distribute the controlled substances. Appellant argues that the link shown between him and the narcotics discovered in the apartment was insufficient to establish his constructive possession of them, and that there is insufficient circumstantial evidence that his possession was with intent to distribute. He contends that the trial court erred in failing to grant his motion for judgment of acquittal at the close of the government's case, and in the alternative that the evidence does not support the conviction. Appellant also attacks the admission of certain documents. We find that the trial court properly denied Davis' motion for judgment of acquittal at the close of the government's case, that the evidence supports the convictions and that the trial was without substantial error, and therefore affirm the judgment as to all three counts.

## I. THE MOTION FOR JUDGMENT OF ACQUITTAL

In passing upon a motion for judgment of acquittal the trial court must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact. *United States v. Fench,* 152 U.S.App.D.C. 325, 333, 470 F.2d 1234, 1242, *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973); *Curley v. United States,* 81 U.S.App.D.C. 389, 160 F.2d 229, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). It is only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury. *United States*

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

v. Fench, supra; United States v. Lumpkin, 145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (1971). In applying this standard no legal distinction is made between circumstantial and direct evidence. Holland v. United States, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Fench, supra. The court must, however, consider only the evidence as it was when the Government rested. Powell v. United States, 135 U.S.App.D.C. 254, 257 n.9, 418 F.2d 470, 473 n.9 (1969); Austin v. United States, 127 U.S.App.D.C. 180, 189, 382 F.2d 129, 138 (1967). Our review of the evidence adduced in the Government's case in chief leads us to the conclusion that a prima facie case had been made against Davis on all three counts.

### A.

■ To prove constructive possession of narcotics the Government must show that the defendant was in a position or had the right to exercise dominion and control over the drugs. United States v. Watkins, 171 U.S.App.D.C. 158, 162, 519 F.2d 294, 298 (1975); United States v. Holland, 144 U.S. App.D.C. 225, 227, 445 F.2d 701, 703 (1971); United States v. Bethea, 143 U.S.App.D.C. 68, 71, 442 F.2d 790, 793 (1972). In addition, the possession under D.C.Code § 33–402 must be knowing, United States v. Watkins, supra; United States v. Weaver, 148 U.S. App.D.C. 3, 458 F.2d 825 (1972). Here, the prima facie showing that appellant was knowingly in a position to exercise dominion and control over the drugs in question rests upon proof that appellant lived in the apartment, that he was physically present there, literally in the middle of all the seized contraband drugs and drug paraphernalia, and that he could observe what was all about him in his apartment. Thus, the jury could have concluded that (1) appellant

was in control of the apartment, the same as any person would be who lived there, paid his share of the rent and was physically present at the time in question, and (2) the presence of the drugs was known to him because substantial quantities were in his plain view, some were located in the closet with the clothes he was wearing, and all were readily accessible to him in areas of the apartment that he would normally frequent and were thus subject to his control. These conclusions are supported by the following evidence introduced in the Government's case in chief.

■ At the time of the search, about 1:00 p. m., appellant and his codefendant Phoenix were found in the apartment. Appellant and Phoenix were wearing only their undershorts (Tr. 62, 64). Phoenix admitted to the police that he "lived in" the apartment and made other statements from which it could be inferred that three people lived there (Tr. 106–107). Davis identified himself to the police in the apartment at the time of the search (Tr. 181), and was identified in court as the Davis who was in the apartment at the time of the search (Tr. 68). It was a stipulated fact that Davis "indicated [to the police] that his address was 1910 Third Street," the address of the apartment (Tr. 468–469). Three pieces of mail matter for all three occupants of the apartment, Davis, Phoenix and Isaac, addressed to them at "1910 Third Street, Apartment 3," were also found on the "mantle, on the shelf, in the living room" where Davis was found (Tr. 88, Govt. Ex. 11A).[1]

■ Three baggies of marijuana were found on a shelf in the living room where Davis was found, 27 in a closet of the living room and another 18 bags elsewhere in the apartment (Tr. 252, 253).[2] The total mari-

---

1. Davis contests on hearsay grounds the admission of these pieces of mail and the police 163 form recording his statement to one of the arresting officers that 1910 Third Street, the address of the apartment, was his address. In view of the stipulation to this effect, Tr. 468–69, we need not reach either issue. If either

admission is objectionable, the stipulation renders both harmless error. Cf. Dissent at n.13.

2. The dissent accurately points out that the initial testimony of Officer Grace, describing the locations of several of the items seized in the bedroom, was stricken by the trial court as hearsay. Infra, 183 U.S.App.D.C. at ——, 562 F.2d at 698, Tr. 220, 224. But the parties

juana weighed 1,134,538.6 milligrams, or about 2.5 pounds (Tr. 249, 347, 354). LSD tablets sufficient for 239 dosages were found in the refrigerator in the kitchen, as were an additional 31 pieces of paper each containing four doses of LSD, *i. e.*, 124 dosages (Tr. 251, 252). Total LSD dosages —363. Smaller quantities of hashish (Tr. 252), phendimetrazine (Tr. 251), cocaine and phenmetrazine (Tr. 252) were also found. Three scales of types commonly used for weighing quantities of drugs were found. One scale was on the coffee table immediately next to the place where Davis was arrested, and another was on a shelf in the same room. (Tr. 64, 65, 66, 87, 184, 269, 270, 274). Marijuana dust and seeds covered the coffee table and saturated the carpet under it (Tr. 65). Also found were a substantial number of boxes and bags suitable for packaging drugs (Tr. 64–65). A marijuana gin, for grinding rough marijuana into a texture like smoking tobacco, was found containing marijuana seeds (Tr. 66, 109, 269, 337). Twenty-five pieces of smoking apparatus containing marijuana residue were found (Tr. 253).

Davis was found in the apartment in the front living room-bedroom in the very middle of all the drugs and paraphernalia (Tr. 64, 65, 66, 77, 78, 86–87, 102–103, 181, 186, 196–198, 248, 252–256, 267–268, 274), much of it in plain view and easily accessible to him. That Phoenix, and not Davis, very quickly disclosed to the police the presence of the large amount of marijuana in the closet and the LSD in the refrigerator[3] does not defeat Davis' joint possession of such drugs. It just happened that the police "asked Mr. Phoenix where the narcotics were" (Tr. 64). From their physical location in the apartment, the fact that both

lived there and the other facts herein before stated, the jury could conclude that the ample quantities of the drugs that were seized, and which were charged in the counts of which Davis was found guilty, were known and equally accessible at the time to both Davis and Phoenix, and that both were in a position to exercise dominion and control over these drugs.[4]

## B.

■ Appellant's intent to distribute the marijuana and LSD could be inferred from the large quantity of the drugs, the fact that the marijuana was packaged as if for sale, the paraphernalia and materials for processing and packaging the contraband, and the marijuana debris which indicated that substantial quantities of marijuana had been handled in the apartment and particularly in the area of the scales. *See United States v. James*, 161 U.S.App.D.C. 88, 112, 494 F.2d 1007, 1031, *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *Williams v. United States*, 55 U.S. App.D.C. 239, 4 F.2d 432 (1925). There was expert testimony that 270 tablets of LSD were more than three persons would possess for their personal use (Tr. 333), and that one person would not possess 1,134,358.6 milligrams of marijuana for his own consumption (Tr. 347). Moreover, a reasonable juror could conclude solely on the basis of the total value of all the drugs in appellant's apartment that they were possessed with intent to distribute. It was testified that the 239 tablets were worth $3 apiece, or $717 (Tr. 331). The additional 31 pieces of paper were worth about $12 apiece, or $372 (Tr. 330–31). Of the total 1,134,538.6 milligrams of marijuana (Tr. 347), 900,260

subsequently stipulated that all of the items introduced as evidence were in fact seized in the apartment, Tr. 249–255. Thus, although there is no admissible testimony in the case regarding the precise locations of, *e. g.*, the 18 bags of marijuana and a number of the smoking instruments, the tangible evidence itself is still in the case.

3. The dissent in n.18 quibbles that the marijuana in the closet did not constitute a "large quantity." It had a value of over $200.00

which, it is submitted, satisfies the questioned description. *See infra*, 183 U.S.App.D.C. at ——, 562 F.2d at 685–686, 687.

4. It was not necessary to rely on any statement of Davis that he was aware of the presence of the drugs because they were in plain view (hashish, marijuana) and in places where he had ready access (closet, refrigerator). This was apparent from the Government's case in chief and was reinforced by testimony adduced from the defense witnesses.

milligrams was packaged in 48 bags (Tr. 253) of the type commonly sold for from $5 to $10 per bag (Tr. 329). Assuming an average value per bag of $7.50, the packaged marijuana alone was worth $360.00.

From all this testimony, i. e., the packaging and processing materials, the wide variety of drugs that were confiscated in the apartment—marijuana, LSD, hashish, cocaine, phendimetrazine, phenmetrazine—the 25 pieces of marijuana smoking apparatus, a reasonable mind could conclude that, even if the three lessors of the apartment were users, they did not possess over $1,449.00 of a wide variety of drugs (Tr. 253, 329, 330–331) for their personal use. Likewise, the Court, considering the evidence in the light most favorable to the Government's case-in-chief could find that a reasonable mind might fairly conclude from Davis' physical presence, his joint interest in the lease of the apartment, the large quantity of a wide variety of drugs (much of it packaged) and the other evidence detailed above that Davis jointly possessed these drugs and that he along with the others intended to distribute the marijuana ($360.00) and LSD ($1,089.00).[5]

**5.** The dissent misconceives the nature of the evidence from which a jury may find intent to distribute or dispense. There is no requirement that the government prove that any particular accused possessor intended *personally* to distribute or dispense. The offense is *"possess[ion]* with intent to . . . distribute, or dispense". 21 U.S.C. § 841(a) (emphasis added). Possession with the requisite intent may be shown by facts other than an intent *personally* to distribute. In fact, where large scale drug operations are uncovered, the intent of those in possession to distribute or dispense is plainly apparent from the large quantities, or packaging, or other attendant circumstances but it is generally others who engage in the actual distribution and sale. For instance, if three people invest $20,000 apiece in 500 lbs. of marijuana and have the the marijuana in a warehouse they jointly rent and each has a key thereto—on those facts alone—*without any proof as to who was going to sell it*—the intent ultimately to distribute can be found to exist by the jury. Under the view of the dissent every wholesaler of narcotics could defend on the ground that he never personally distributed or dispensed but left those functions to his partners. This case, in a lesser degree, is similar. From the joint venture in leasing the apartment and each paying rent *for a limited purpose*

## II. THE JURY VERDICT

The Government's case was greatly strengthened by the testimony introduced by the defendants and through their cross-examination after the close of the Government's case in chief. A review of the entire record thus reveals even more compelling evidence supporting appellant's conviction.

The testimony of the complete trial permitted the jury to conclude even more conclusively that the appellant was acting in concert with his codefendants, and that they had exclusive joint-control over the apartment. The three defendants were old "friends" from Cleveland, Ohio (Tr. 605, 710, 711), and were close together in age (Tr. 605). Isaac and Davis were cousins (Tr. 579, 590, 711). The three *acted jointly* in renting the apartment, and split the rent of $115 or $125 per month "three ways" (Tr. 602, 604, 710). Davis and the other defendants each had a key to the apartment as did a girlfriend, Miss Pat Seabury (Tr. 601–602), but she had been away from the apartment for more than three months prior to the search of the apartment and the arrest of appellant (Tr. 717).

—the possession of the keys to the apartment—the large quantity and variety of drugs—with some of it packaged as if for sale—the processing and packaging paraphernalia and the evidence of large scale packaging—and the physical presence of Davis in the midst of all the drugs—marijuana, hashish, cocaine, LSD, phencyclidine and phenmetrazine—indicated an unlawful drug operation of sufficient magnitude to support a finding of intent to distribute or dispense—without any showing that any particular defendant would himself *personally* distribute or dispense. The plain inference from the facts is that those who possessed the drug did so with intent either to distribute or dispense personally or to cause it to be distributed or dispensed by others. 18 U.S.C. § 2. Who the actual distributors or dispensers might turn out to be is not important—what is plain from the evidence is that those who possessed the drugs—and Davis was one of those—clearly intended that the drugs would be dispensed or distributed. Also, from all of this evidence the jury could, and obviously did, find that Davis, from his physical presence in the apartment and his relation to it and its contents, intended to exercise dominion and control over the drugs. On appeal that finding must be credited by the court.

■ The jury could also conclude that Davis had personal control over the apartment and knowledge of and control over the drugs.[6] Davis testified that, at the time the drugs were seized, the apartment was "his residence" (Tr. 575) and his mailing and legal address (Tr. 575, 576). He admitted having access to all parts of the small (Tr. 593) apartment, not only the common areas which were strewn with drugs and paraphernalia, but also the closets and the refrigerator where large quantities of the drugs were found (Tr. 591, 619), and the bedroom (Tr. 592); "many times" he "would be the only one" in the apartment (Tr. 587). Davis kept some of his clothes in the living room-bedroom closet (Tr. 616–17) where 27 bags of marijuana were found (Tr. 87), and other clothes in the bedroom closet (Tr. 593). While in the apartment Davis generally slept in the permanent bed in the bedroom (Tr. 585) while Isaac slept on a pull-down mattress (Tr. 585–86, 702–04). Davis testified that Issac was there only "occasionally" (Tr. 584). This testimony could lead the jury to conclude that Davis' relationship to the apartment and its contents was stronger than that of Isaac.

Davis claimed, however, that while he had lived in the apartment on a "full time basis" from August 1972 to January or late December 1973 (Tr. 578, 603, 604), at the time of his arrest on March 6, 1974, he was only there "occasionally" (Tr. 584) and that other times he was at his girlfriend's place (Tr. 584, 576). According to Davis, "not any one defendant used that particular apartment all the time" (Tr. 584). This testimony evoked the inquiry from other defense counsel that, "Then might it be fair to say that you were using the apartment at 1910 Third Street *for some other purpose*" (Tr. 623). Davis' reply was: "No, sir, other than the purpose of a mailing address" (Tr. 623). That he would continue to pay his one-third of the rent for several months merely for a "mailing address" was testimony that the jury could disbelieve and it is apparent that the jury did not credit his testimony in this respect. The jury was not required to.

The testimony of all three defendants sought to minimize their presence at the apartment and to assert that all of them were largely ignorant of the ownership[7] of contraband drugs throughout the apartment (Tr. 648–50, 683, 688, 695, 705, 721). Even Phoenix, who was caught with Davis in the apartment at the time of the search, claimed he was not aware of drugs other than those he disclosed to the police (Tr. 648). The claim of the parties was that they "suspected" (Tr. 649) that an incompletely identified third person with a first name of Stewart, and an unknown "Arabic" type last name (Tr. 724), who operated "like a shadow in the dark" (Tr. 683), apparently owned the drugs (Tr. 648–651, 664–667, 682). The defendants testified that Stewart worked with Davis at a clothing store (Tr. 665) and used the apartment where the drugs were seized "quite a bit" (Tr. 650) *but paid no rent.* Phoenix testified that the marijuana had been in the apartment for two days prior to the search and seizure (Tr. 668) and he had seen the LSD in the refrigerator 4 days before the seizure (Tr. 670). Isaac tried to escape knowledge of the drugs inside the refrigerator by testifying that "nobody used ice" in alcoholic drinks (Tr. 723–724). Phoenix did allow that the drugs "could have belonged to Davis or Isaac" (Tr. 688, 666) and it was clear that the jury could reach the same conclusion.

---

**6.** In several instances the dissent displays its erroneous analysis of the offense by referring to whom the drugs "belong," *Infra,* 183 U.S. App.D.C. at —— n.9, 562 F.2d at 694, 695 n.9. The offense is based on "possession," not ownership. To assert that one can divest himself of constructive possession by treating the drugs as belonging to a roommate and having no intent of exercising dominion and control over the drugs may have some force as an abstract proposition; but the jury were free to find to the contrary on the evidence here. Evidence of such divestiture or lack of intent was not present when the court ruled at the close of the Government's case in chief and the jury were not compelled to draw such inferences from subsequent testimony. Also *see* n.11 *infra.*

**7.** *See* note 6 *supra.*

■ Based on all the evidence, the jury could disbelieve defendants' incriminatory denials and conclude that each defendant was attempting to hide his knowledge of the drugs. Juries may use their common sense to look through testimony and draw inferences from all the surrounding circumstances that may conflict with specific statements. *Cf. Giacona v. United States,* 257 F.2d 450, 454 (5th Cir.), *cert. denied,* 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958). The jury found, and the dissent agrees, that there was sufficient evidence to support appellant's conviction for possession of hashish. The testimony that proves possession of the contraband specified in the other two counts is not substantially different from the evidence the dissent admits proves possession of the hashish and we conclude that the jury's finding that appellant possessed the LSD and marijuana is supported by the evidence.

■ The jury could likewise have concluded from all the evidence that the LSD and marijuana were possessed with intent to distribute them. *See* n. 5, *supra* and n. 8, *infra.* It was a reasonable inference that Davis was one of the co-possessors who *intended* to participate in the distribution of the drugs because, in addition to the evidence in the Government's case in chief, if Davis were to be believed, he continued to pay one-third of the rent of the apartment, where this illegal operation was centered, for several months after his only admitted use of the apartment was for "the purpose of a mailing address" (Tr. 623). But young people do not ordinarily pay rent on apartments for such a limited purpose. The jury could conclude that Davis had some joint monetary purpose with his codefendants *that he wished to conceal* and that this monetary purpose was to participate in selling the drugs which were located throughout the apartment.[8] The jury could also conclude that Davis' purpose in paying rent was to live there.

■ The dissent would set aside the convictions on counts one and two (possession with intent to distribute) on the grounds that there was insufficient evidence of appellant's possession of the large quantities of LSD and marijuana upon which these counts are based, and that therefore there has been no showing that appellant had the specific intent to transfer drugs. The dissent would fashion a standard that would limit possession in cases of joint occupancy, absent specific evidence linking a particular defendant to the partic-

---

8. The dissent in Part II D (183 U.S.App.D.C. at 562 F.2d at 700–701, infra) contends that the interpretation of the evidence with respect to Davis' relationship to the apartment that is advanced in support of the jury finding that he intended to distribute the drugs (183 U.S.App.D.C. at ——, 562 F.2d at 687, *supra*) is inconsistent with the interpretation advanced to support its finding that he was in constructive possession of the drugs (183 U.S.App.D.C. at ——, 562 F.2d at 684 n.6, *supra*). In furtherance of this argument the dissent fractures the grounds relied upon and twists the comments made with respect to Davis' testimony minimizing his use of the apartment into a claim of erroneous inconsistency. Not so.

Davis testified in response to a question by counsel for his co-defendants that he used the apartment at 1910 Third Street for no purpose "other than the purpose of a mailing address" and otherwise only stayed there on "extraordinary situation[s] (Tr. 623). With respect to this testimony we point out the obvious, *i. e.,* that "young people do not ordinarily pay rent on apartments for such a limited purpose." Hence, we contend, the jury could *reject* such testimony and find that he had *both* a "monetary purpose" *and* a residential purpose in paying rent on the apartment. Such purposes support *both* constructive possession and intent to distribute and such conclusions are supported by other substantial evidence as well.

As stated in the text *supra,* 183 U.S.App.D.C. at ——, 562 F.2d at 688, the jury's verdict on the counts charging intent to distribute is supported by *"all the evidence"* and the assertion that Davis had a "joint monetary purpose" probative of his intent to sell which he was trying to conceal by his testimony is not in any way inconsistent with the jury finding that he was also trying to conceal his more extensive use of the apartment which was also probative on the issue of constructive possession: in other words that Davis "lived" there, as he said he did, and also that he intended to distribute the contraband he possessed. For other testimony from which the jury could find the requisite intent to distribute *see* the text accompanying this footnote. The dissent erroneously assumes that the jury must accept Davis' testimony. It need not. *See Giacona v. United States, supra.*

ular drugs seized, practically to the immediate area within reach of the accused at the time he was arrested. While this may be a valid limit for the area that may be searched without a warrant, it expresses an unduly restrictive concept of the limits of possession of articles within one's residence. The correct law is expressed in the instruction given to the jury.[9] Criminal laws are to be strictly construed in favor of the accused, but not to the point of unreason. Proof of guilt beyond a *reasonable* doubt is all that is required.[10] Given the joint-participation between appellant and his codefendants in leasing the apartment, the substantial size and nature of the apparent

**9.** The dissent suggests that the jury may have misunderstood the definition of constructive possession, dissent at n. 5. There is no factual support for this claim. The following instruction on the issue of possession was given by the trial court both during the trial (Tr. 684–85) and at its conclusion (Tr. 798–99). It was not objected to at trial or on appeal:

> The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.
>
> The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.
>
> Mere presence in the vicinity of a narcotic drug or mere knowledge of its physical location, does not constitute either actual or constructive possession.
>
> You may find that the requirement of possession is satisfied only if you find beyond a reasonable doubt that the defendant had actual or constructive possession either alone or jointly with others.

Recognizing its importance to their deliberations, the jury requested and were given a typewritten copy of this part of the court's instructions (Tr. 810–814) with a change suggested by Davis' counsel to particularize that

> [m]ere presence in the vicinity of a narcotic drug, or mere knowledge of its physical location does not constitute *either constructive possession or actual* possession.

(Tr. 811–812) (emphasis indicates added matter). There is thus no basis to conclude or even suggest that the jury were not thoroughly familiar with the court's instruction in this particular, or that the instruction did not comport with the case law.

There is no justification on this record for the assertion in the dissent that the jury were "confused" when they requested a written copy of the instruction on constructive possess. Dissent at n. 5. Such request was equally consistent with a desire to be completely accurate in following an instruction on an important issue in the case.

**10.** The dissent relies in part upon Whitebread & Stevens, *Constructive Possession in Narcotics Cases: To Have and Have Not,* 58 Va.L.Rev. 751 (1972). The authors of the article, however, are in error in a fundamental premise. They state that where circumstantial evidence is relied upon, "the state must overcome all reasonable inferences of innocence." *Id.* at 765. But this view of the burden of proof in such cases was rejected by the Supreme Court in *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–138, 99 L.Ed. 150 (1954):

> The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions, *Garst v. United States,* 4 Cir., 180 F. 339, 343; *Anderson v. United States,* 5 Cir., 30 F.2d 485–487; *Stutz v. United States,* 5 Cir., 47 F.2d 1029, 1030; *Hanson v. United States,* 6 Cir., 208 F.2d 914, 916, but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, *such an additional instruction on circumstantial evidence is confusing and incorrect, United States v. Austin-Bagley Corp.,* 2 Cir., 31 F.2d 229, 234, cert. denied, 279 U.S. 863 [49 S.Ct. 479, 73 L.Ed. 1002]; *United States v. Becker,* 2 Cir., 62 F.2d 1007, 1010; 1 Wigmore, Evidence (3d ed.), §§ 25–26.
>
> Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

(Emphasis added). The article's misstatement of the burden of proof makes it unreliable for our purposes, and the dissent is in error in relying upon it.

drug activities and their extensive presence throughout the apartment and appellant's physical presence surrounded by contraband substances, we conclude that the jury was perfectly within the law in finding that appellant possessed the drugs in question.[11]

Many of the same factors lead us to reject the dissent's conclusion that appellant was not shown to share his codefendants' intent to distribute the drugs. The jury could reasonably conclude from the joint participation of the defendants in the lease of the apartment, and the testimony as to their actual physical presence when arrested and at other times, that they all harbored the same intent.[12]

The dissent also contends that the quantity of marijuana, while more than enough for *one* person's own use, might be within the ordinary use of three people. Dissent at n. 18. It was previously noted that the quantity of LSD exceeded what would normally be possessed by three persons for their own use. However, there is more evidence of intent to distribute in this case than quantity alone. According to Davis (Tr. 581) and Isaac (Tr. 708, 721), they only used marijuana "occasionally" and Phoenix testified he would not "consume all the marijuana," (Tr. 669) so the testimony as to the amount is helpful but not conclusive. There is also the wide variety of drugs, the exceptionally high dollar value of the drugs, the drug paraphernalia, the processing and packaging material and the packaging. To rely solely on quantity is to take a narrow view of the evidence from which the intent to distribute might be inferred. The presence in the apartment of 25 pieces of smoking apparatus[13] is mute evidence from which a jury could conclude that more individuals than the defendants were smoking the marijuana in the apartment and that those who rented and occupied the apartment and possessed the 25 pieces of smoking apparatus did so as part of a marijuana distribution operation.

The decisions upon which the dissent principally relies are factually distinguishable from the present case. In each, there was proof of proximity to the narcotics but *no substantial evidence of a proprietary interest* in the premises where the drugs were found, *i. e.*, that the defendant lived in or controlled the apartment. In *Moore v. United States*, 429 U.S. 20, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976) (per curiam), appellant was found, apparently unconscious, near bags of heroin and narcotics paraphernalia. The only evidence of Moore's control of the apartment, however, was an out-of-court statement of an informant which was inadmissible as evidence. The Court found the trial court's reliance on this statement to be error and remanded for a determination whether it was harmless.[14] Similarly, in

---

**11.** The dissent misses the mark in discussing to whom the drugs "belong" (dissent at n. 9). It is *possession* that constitutes the offense under the statute, not ownership. And while an individual may have a certain possessory right in contraband superior to anyone except the state or its agents, *People v. Walker*, 33 Cal.App.2d 18, 90 P.2d 854, 855 (1939), there is no property right in contraband property. *See, e. g., United States v. Sischo*, 262 F. 1001, 1009 (D.Wash. 1919); *State v. Bryant*, 250 So.2d 344, 346 (Fla.App.1971); *Reese v. State*, 140 Tex.Cr.R. 101, 143 S.W.2d 395, 396 (Crim.App.1940). The jury could reasonably have concluded that while someone else, for example "Stewart," had a superior right to possession of the drugs, the defendants also at the time in question "possessed" them with intent to distribute as charged in the indictment. In fact that seems to be the most usual drug transaction in the District. A dealer owns the drugs and he gets some pushers to sell the drugs and then they split the money received for the sale. Also *see* n. 6 *supra*.

**12.** *See* n. 5 *supra*. We place no reliance on the fact that in paying on an apartment obviously devoted in large part to the illegal drug traffic, even if limited only to storing the drugs, appellant was helping furnish a place for the commission of crimes and hence could have been convicted as an aider and abettor under 18 U.S.C. § 2.

**13.** (Tr. 253).

**14.** An informant had tipped the police that Moore and others were in possession of heroin at "Moore's apartment," 429 U.S. at 21, 97 S.Ct. at 30. The police obtained a search warrant, entered the apartment and found Moore lying face down near a coffee table in the living room. A woman was sitting on a couch in the same room. Bags of heroin found on top of

*United States v. Watkins, supra,* the only evidence of the appellant's control of the apartment, rent and utility receipts for two months, was excluded as hearsay. In *United States v. Bethea, supra,* the controlled substance was found concealed under the back seat of an automobile. The appellant was riding in the front passenger's seat and he had no proprietary interest in the car.

In *United States v. Holland, supra,* there was no proof that appellant was other than an overnight visitor in a girlfriend's apartment. The opinion states that it was "the apartment of the woman," 144 U.S.App. D.C. at 226, 445 F.2d at 702, not the defendant Holland. The dissent seems oblivious to this material factual difference. The dissent is also in error when it contends, on the basis of some language in the *Holland* opinion, that in this case, and presumably every case, proof of dominion and control is narrowly restricted to evidence showing the "regularity with which [the defendant] oc-

cupied the place". 144 U.S.App.D.C. at 227, 445 F.2d at 703, *quoted in* dissent at n. 20. But *Holland* was a case where no *proprietary* interest in the premises was shown, where the arrest of the defendant resulted from his being found in an apartment that was not shown to be his own. To point out that Holland's presence in the apartment *in that case* was not shown to have been with sufficient "regularity" to justify a finding that he constructively possessed the articles in the apartment where he was found does not mean that the equivalent of regular occupancy, *i. e.,* the ability to exercise dominion and control over the contents of the apartment, cannot be subsumed from other facts. That is the case here where a proven proprietary interest, actual physical presence of the defendant in an alert mental condition, coupled with an admission by Davis that he "lived" in the apartment and had a key to it, clearly was sufficient evi-

and beneath the coffee table were seized along with various narcotics paraphernalia. However, the police found no indicia of ownership of the apartment.

In finding Moore guilty of possession with intent to distribute (21 U.S.C. § 841(a)(1)) the trial court *"expressly* relied on the hearsay declaration of the informant". 429 U.S. at 21, 97 S.Ct. at 30 (emphasis in opinion). The Supreme Court found this to constitute error because it deprived Moore of the opportunity to cross-examine the informant as to the factual basis for believing that Moore was a "tenant or regular resident there," and otherwise to attack the testimony.

Speaking to the probative effect of Moore's proximity to the heroin, the Court stated:

Whether or not the evidence of proximity *alone,* when viewed in the light most favorable to the prosecution, could suffice to prove beyond a reasonable doubt that Moore was in possession of the heroin, the fact is that the trial court did not find Moore guilty on that evidence alone.

429 U.S. at 22, 97 S.Ct. at 30 (emphasis added). From these facts the dissent asserts that "Moore's more general message [for us, is] that we should be cautious in inferring possession from the fact that one is found near drugs . . . ." Dissent at n. 16.

Moore has limited relevance to this case because of the material difference in critical facts. It was *stipulated here,* and hence in evidence, that one of the policemen would testify that after the execution of the search warrant at the apartment

he spoke to an individual who identified himself as Joseph Davis. That this individual stated that *his residence* was . . . Apartment No. 3 . . . .

where he was arrested (Tr. 575). Thus, whereas in *Moore* there was no competent evidence of Moore's residence, the fact finder in this case could find on the basis of competent testimony that appellant *lived* in the apartment. Moreover, Davis was awake and in possession of his faculties when he was arrested. He could see what was all about him in plain view and he apparently had the ability of a normal sober individual to control what was about him in his own apartment. Moore was "lying face down," apparently sleeping or under the influence of something.

In addition, the case against Davis, unlike that against Moore, does not rest solely on a large quantity of a *single* drug. Instead, there was a very substantial quantity of two drugs and a wide variety of other contraband drugs. A substantial quantity of one of the drugs was packaged as if for sale, and the paraphernalia scattered throughout the apartment included articles used in processing marijuana and packaging it for sale.

The real "general message" from *Moore* is that in a substantially weaker case than the present one, the Supreme Court did *not* find proximity alone to be an *insufficient* basis for a finding of possession. The much stronger facts in the present case fully justify an inference of possession.

dence for a jury to conclude he was in a position to exercise dominion and control over the contraband drugs in the apartment to which he had ready access at the time in question.[15]

The naivete of the dissent is almost unbelievable where it characterizes the "apparently *innocent* ordinary kitchen objects such as plastic bags and food scales" (dissent at n. 17) (emphasis added). The difficulty that a reasonable mind has in so viewing such articles here is that *three* kitchen scales could hardly be found in 1% of the homes of the United States. And even if one home had three kitchen scales it is submitted that it would be rare to find two of them *in the living room* at the same time. And it would be even more rare to find any person who would truly believe that when two "kitchen" scales were found in a living room with marijuana seeds and marijuana litter all around on the floor and additional large quantities of *packaged* marijuana and hashish, the scales were not intended to be and had not been used to weigh the marijuana prior to packaging. This conclusion becomes absolute, and the intent to use the "kitchen" plastic bags for the illegal purpose of packaging contraband drugs is irrefutably proven by the testimony that the dissent's "innocent" plastic bags were *actually* used to package the $5 and $10 baggies of marijuana in *uniform* quantities which only weighing scales could produce. In the face of such strong evidence to the contrary it is highly unreasonable to even suggest

that the scales and the bags were possessed for culinary purposes.

 The jury were therefore fully justified in reaching the only realistic conclusion that such evidence justified, *i. e.*, that the scales and the plastic bags were further evidence of intent to weigh, package and sell marijuana. Any reasonable juror would conclude that if one intended marijuana for his own use he would not go to such extreme pains to package it in the uniform quantities in which it is often sold on the streets.[16] Thus, such packaging may be taken to indicate an intent to sell.

The facts of the above cited cases differ in almost all material respects from the facts of this case and their holdings are thus not applicable here.

The dissent also relies upon *United States v. Bonham,* 477 F.2d 1137 (3d Cir. 1973) (en banc). In that case two half brothers were convicted at trial of possessing heroin found hidden in a recess behind the door frame of a room they shared. The Third Circuit reversed on the ground that the appellant had not been shown to be in constructive possession of the heroin. *Bonham* is distinguishable since the conviction there rested *only* upon possession of the heroin and there was no proof that the drugs in question or other contraband substances or narcotics paraphernalia were *in view* sufficiently to indicate that appellant knew about the contraband and hence could be found to be in possession of the hidden drug.[17] In connec-

---

15. Also *see* n. 5 *supra.*

16. Tr. 329–330.

17. The court noted:

> No other heroin was found upon the person of either defendant or elsewhere in the room. One of the officers testified that suspicious articles other than heroin, which he called "suspected marijuana" and "suspected phenaphen tablets" were observed in plain view on a table. No proof was introduced that these articles were what the officer suspected, and they are not a subject of this prosecution.

477 F.2d at 1138. The fact that the suspected drugs which were *in plain view* were not a subject of prosecution in *Bonham* is one additional element that distinguishes that case from

this case and makes it inapplicable here. The Third Circuit also stated in dicta that

> even if the prosecution had proved that these articles were marijuana and phenaphen, as the officer said he suspected, appellant's awareness of their presence would be no evidence of knowledge that heroin was concealed elsewhere.

477 F.2d at 1139, *quoted in* dissent at n. 16. This dictum is not inconsistent with appellant Davis' conviction for possession of marijuana with intent to distribute, even though much of the marijuana was found in the closets, since a substantial quantity of the *same* drug, together with equipment and materials for processing it, was found *in plain view* in Davis' apartment. Appellant's constructive possession of the hidden quantities of that drug could thus be inferred, but it is not necessary here to rely on

tion with the federal offense, if facts are not present from which knowledge of the presence of the contraband can be concluded, a finding that one "knowingly" possessed the drugs would be impossible to support. Such facts were not present in *Bonham* but they are present here.

The dissent accurately points out that, under our case law in this circuit, proof of a proprietary interest in or regular occupancy of the premises *alone* is not sufficient to prove constructive possession, dissent at n.7. This was made clear to the jury in the typewritten instruction given them on this issue, n.9 *supra.* As the jury concluded, the facts here reveal considerably more than just a proprietary interest. The joint participation between the appellant and his codefendants in the leasing and occupancy of the apartment, appellant's presence in the apartment at the time the drugs were seized, the obvious nature of the large-scale processing activities of a wide variety of various drugs, the presence of used drug consuming equipment in the apartment, and the obvious unreasonableness of the explanation he gave for continuing to pay rent on the apartment, with the other evidence previously referred to, could reasonably have convinced the jury that appellant jointly possessed the marijuana and LSD with which he was charged and that he intended to distribute it.[18]

As for the attempts by the dissent to introduce factual considerations into the judgment which are outside the jury record, we see no need to discuss them—nor do we see any need to point out the obvious tortured view of the offenses charged in this case to which they are addressed. See Part III of dissent. The fact that other evidence might not incriminate Davis does not answer the fact that the evidence here does support the jury's verdict. In coming to this conclusion it should also be pointed out that the principal defect in the dissent is its almost complete basic failure to recognize the probative effect of circumstantial evidence and the reasonable inferences that the jury may draw therefrom [19] and its similar failure to recognize the limited authority of appellate courts to overturn factual determinations by juries based on substantial evidence.

We thus find that the court properly denied Davis' motion for judgment of acquittal after the close of the government's case in chief, and that the evidence obtained when the defendants took the stand increased the evidence in support of the jury's verdict.

■ We affirm the judgments of conviction on all three counts.[20]

---

this logic as appellant's clothes in the closet where the drugs were found and his access to such closets would be sufficient for that purpose. To the extent that this dictum in *Bonham,* or the alternative rationale if we choose to call it such, is inconsistent with appellant's conviction for possession of LSD with intent to distribute, we decline to follow it. The evidence of the defendants' joint possession and intent to distribute both the marijuana and the LSD found in the apartment is sufficiently strong on the facts of this case to support appellant's conviction on both of these counts.

18. In n.17 the dissent seeks to offer innocent excuses for the drug "paraphernalia." The paraphernalia could have been used for an innocent or an illegal purpose but, what the dissent overlooks, is that it was for the *jury* to decide on all the evidence what use was intended. And with all the drugs around and all the scraps littering the floor and the "*innocent* [?] ordinary kitchen . . . plastic bags" (dissent at n.17) being used to package large quantities of contraband marijuana it was perfectly

reasonable for the jury to conclude, as they did, that the paraphernalia was intended to serve an illegal purpose. The dissent refuses to recognize this finding but it is one of the most elementary rules of appellate procedure that on appeal the facts are to be construed most strongly in favor of the jury's verdict. That rule disposes of the dissent's "innocent" argument. It also disposes of the dissent's claim that appellant's presence might have been innocent. That too was a jury question and there was sufficient evidence for the jury to return the verdict of guilty that it did.

19. It is this erroneous approach to the evidentiary record that is the basis for the assertion by the dissent that the affirmance of the jury's verdict is based on a "shaky conclusion." 183 U.S.App.D.C. at ——, 562 F.2d at 700, *infra.*

20. The Government set out to prove the location of each of the quantities of drugs in a very precise manner but was hindered in doing so by the trial court. Example:

BAZELON, Chief Judge, dissenting in part, concurring in part:

Three Howard University students were tried and convicted by a jury of possession and possession with intent to distribute narcotics found in an apartment they shared.[1] On this appeal, one of them challenges the sufficiency of the evidence to support his conviction. Unfortunately, the majority's analysis ends where it should begin—with a recital of the evidence indicating that at least one (but not necessarily all) of the three occupants of the apartment was selling drugs.

Painting with a broad brush, the majority demonstrates conclusively that there is guilt in the air. But guilt by association cannot support a conviction. There must be evidence which permits a reasoned inference that a particular individual was engaged in the charged activity.[2] The record reveals no such evidentiary nexus with this appellant regarding the charges of possession with intent to distribute. Granted, there is plenty of evidence from which a jury might infer that *someone* intended to distribute the drugs found in the apart-

THE COURT: I think all you need to show is that these were in the apartment . . . .

But to go through this in all this minute detail does not assist you in your case at all. (Tr. 84)

MR. HANNY: This will be the last item, Your Honor.

THE COURT: I hope. (Tr. 344)

Fortunately for the Government it was able to introduce enough specificity as to the location of some of the drugs to support the jury's verdict but its case could have been immeasurably strengthened, and the questions on appeal substantially reduced, had it been permitted to introduce evidence of what the court termed "minute detail." The intent and accessibility of the parties in these cases is traditionally proved by a collection of minute details and the Government should not be hindered in offering such proof. While guilt may be apparent to the trial judge he does not return the verdict and he should not forget that jurors are not as perceptive as judges and that the Government's burden of proving its case beyond a reasonable doubt is a very substantial burden which gives it a right, with which the court should not interfere, to introduce all the competent direct and circumstantial evidence that is probative of guilt or innocence. There is no exclusionary rule for minute evidence.

ment; there is no evidence that *this appellant* was the one.

### I

Possession with intent to distribute requires proof of three elements: (1) that defendant possessed contraband, (2) that he did so knowingly and intentionally, and (3) that he harbored the specific intent to transfer it to another. The possession element may, of course, be satisfied by "constructive possession." Although lacking direct physical control, if someone "knowingly has both the power and the intention . . . to exercise dominion and control," he is in constructive possession.[3]

Constructive possession requires that a defendant know how to get at the narcotics (either directly or through an agent). Without such knowledge, the necessary "power" to exercise dominion and control is lacking. However, "mere presence in the vicinity of a narcotic drug, or *mere knowledge of its physical location*" is not sufficient as a matter of law to establish constructive possession.[4] Even though someone has the "power" to exercise dominion

1. At the close of the Government's case, the trial judge dismissed four counts of the indictment charging possession with intent to distribute phencyclidine and hashish, simple possession of marijuana, and receipt of stolen property. The jury convicted appellant and his two co-defendants of possession with intent to distribute L.S.D., possession with intent to distribute marijuana, and simple possession of hashish. The jury acquitted them of possession of phenmetrazine and cocaine.

2. *United States v. Coombs*, 150 U.S.App.D.C. 333, 464 F.2d 842 (1972); *United States v. Lumpkin*, 145 U.S.App.D.C. 162, 448 F.2d 1085 (1971); *Crawford v. United States*, 126 U.S. App.D.C. 156, 375 F.2d 332 (1967); *Curley v. United States*, 81 U.S.App.D.C. 389, 160 F.2d 229, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

3. Instruction 4.32, Criminal Jury Instructions for the District of Columbia, (2d ed., 1972). *See also United States v. Palmer*, 151 U.S.App. D.C. 317, 467 F.2d 371 (1972) (per curiam).

4. *Id.* (Emphasis added).

and control over an object, he is not in constructive possession unless he also has the "intention" to do so. If one is aware of where his roommate keeps narcotics (and therefore may have power to exercise dominion and control), he is not guilty of constructive possession so long as he treats the drugs as belonging to the roommate and has no intention of exercising dominion and control.[5]

These settled principles have particular application where narcotics are found on premises occupied jointly. Where only one person inhabits an area, it is reasonable to infer in the first instance that anything found there belongs to him.[6] That inference is unavailable among joint inhabitants. Drugs found in an apartment occupied by several persons may be in the constructive possession of only one of the occupants, several of them jointly, or all of them. Based *solely* on the fact that drugs are on the premises, a jury may not conclude beyond a reasonable doubt that they are in the constructive possession of any particular defendant.

The vast majority of courts therefore hold that "where the defendant is in nonexclusive possession of premises on which illicit drugs are found, it cannot be inferred that he knew of the presence of such drugs and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference."[7] If the Government is unable to pinpoint which co-tenant is responsible for the presence of the drugs, it cannot sustain the charge against any of them, even though at least one is almost certainly guilty. But the alternative is conviction of

5. Constructive possession cases almost always require juries to draw subtle inferences regarding "the power and the intention to exercise dominion and control" indirectly from circumstantial evidence. Since the concepts involved are almost metaphysical, and easily misunderstood, judges should be especially vigilant to insure that there is adequate evidence to support a jury verdict. *See generally*, Whitebread & Stevens, *Constructive Possession in Narcotics Cases*, 58 Va.L.Rev. 751, 759–762, 765–66 (1972).

The danger that the jury has misunderstood what is required to convict is especially great here, where the jury was so confused by the definition of constructive possession that it requested a written copy of this portion of the instructions. Tr. 810.

The majority's criticism of this opinion on the grounds that it "relies in part upon Whitebread & Stevens," *supra*, Majority op. at n.10, is misplaced. It is by no means clear that Whitebread & Stevens misstate the burden of proof, as the majority suggests. The full text of their comment is "Fourth, the jury's willingness, despite curative instructions, to infer knowledge from slight circumstantial evidence shifts the burden of persuasion to the defendant regardless of the theoretical formulation that *the state must overcome all reasonable inferences of innocence*," 58 Va.L.Rev. at 765 [emphasis indicates portion quoted in majority opinion]. As I read it, this is a reference to a case cited in the note on the preceding page and decided in a state which apparently does still adhere to the "negate all other reasonable inferences" formulation. *See id.*, at 764 n.31, quoting from the dissent in *People v. Valot*, 33 Mich.App. 49, 189 N.W.2d 873 (1971).

6. *See* Whitebread & Stevens, *supra* note 5, 58 Va.L.Rev. at 763–64. *See also* 9 Wigmore, Evidence, § 2515 (3d ed. 1940). Of course, constructive possession as defined above is not entirely congruent with "ownership." A converter, for example, can be in constructive possession, as could a roommate who knows where drugs are hidden and intends to steal them.

7. Annotation, *Conviction of Possession of Illicit Drugs Found in Premises of which Defendant was in Nonexclusive Possession*, 56 A.L.R. 3d 948, 957 (1974). *Accord United States v. Bonham*, 477 F.2d 1137, 1139 (3rd Cir. 1973) (en banc); *Evans v. United States*, 257 F.2d 121, 128 (9th Cir.), *cert. denied*, 358 U.S. 866, 79 S.Ct. 98, 3 L.Ed.2d 99 (1958).

Nothing in my opinion in *United States v. Holland*, 144 U.S.App.D.C. 225, 445 F.2d 701 (1971), was intended to abrogate this widely recognized principle. *Holland* was a case involving an over-night visit by members of opposite sexes. We held that before a jury could make an inference of constructive possession, it must at a minimum have before it "information about the regularity with which the person in question occupied the place and about his special relationship with the owner or renter." At 227, 445 F.2d at 703. But *Holland* clearly did not adopt the converse: that proof of regular occupancy is *sufficient* to establish constructive possession. (The majority agrees. Majority op., —, — of 183 U.S.App.D.C., 692, 693 of 562 F.2d) Nor could it have done so in light of the definition of constructive possession discussed above.

the innocent with the guilty—something which has always been abhorrent to our legal traditions: "It is better that ten escape than that one innocent person suffer."[8] Even where narcotics offenses or other crimes arousing great public outrage are involved, condemning the innocent is an intolerable price for letting none of the guilty escape.

Moreover, the Government's burden to link drugs to an individual is not an unreasonably heavy one. A variety of evidentiary details will sustain an inference that a particular defendant had both the power and the intention to exercise dominion and control over narcotics, as the cases cited by the Government illustrate. It may be shown that the narcotics were found in a place over which the defendant had special control, such as a closet containing his clothing. *Walker v. United States*, 489 F.2d 714, 715 (8th Cir. 1974). Or that a particular defendant had in his special control paraphernalia for preparing the drugs for sale or use. *United States v. James*, 161 U.S.App.D.C. 88, 111–112, 494 F.2d 1007, 1030–31, *cert. denied sub nom. Jackson v. United States*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974) (paraphernalia in a locked box in defendant's dresser); *Petley v. United States*, 427 F.2d 1101, 1106 (9th Cir. 1970) (pipe containing marijuana residue found in defendant's duffel bag).[9] The defendant's actions or statements may indicate a consciousness of guilt. *United States v. Childs*, 463 F.2d 390 (4th Cir. 1972) (false name given to pick up trunk containing

drugs). Or the drugs may be in plain sight in such close proximity to a defendant that it is reasonable to infer that they were under his control. *United States v. Davis*, 461 F.2d 1026, 1036 (3rd Cir. 1972) (heroin being packaged for sale at kitchen table while defendant stood a few feet away washing dishes).[10]

## II

The facts do not meet the foregoing legal requirements. The evidence disclosed small quantities of marijuana and smoking apparatus in plain view—which may be consistent with recent *use*. It may be assumed that these small amounts of the drug would have supported a conviction for mere possession. However, the Government's case was devoid of anything indicating knowledge and an intention to exercise dominion and control by this individual over the *separate* large quantities of drugs found elsewhere in the apartment *on which the two counts of possession with intent to distribute are based.*

### A.

At approximately one o'clock in the afternoon of March 6, 1974, Officers of the Metropolitan Police Department armed with a search warrant broke down the door to apartment three at 1910 3rd Street N.E. They discovered the appellant and a co-defendant, Purnell Phoenix, standing in the living room clad in their undershorts. A third co-defendant, John Isaac, the appel-

---

8. Blackstone, Commentaries on the Laws of England, iv, 27.

9. Mere presence of paraphernalia in common areas occupied by several persons is as ambiguous as the presence of drugs themselves—either might belong to only some inhabitants. This is especially so when the drugs are hidden, so that other inhabitants may be completely unaware of their presence, or when the "paraphernalia", although visible, consists of ordinary objects such as plastic bags or kitchen scales which are innocent in appearance but "could" be used to prepare drugs for sale.

10. Those cases which rely on "plain view" to show that several individuals intended to exercise joint dominion and control rest on assumptions which are ripe for reexamination. Cer-

tainly "plain view" supports an inference of knowledge, but it is also probative of an intention to exercise dominion and control? The premise must be that one who is aware of the presence of narcotics would not remain in the vicinity unless he was a coventurer. That inference may have been valid in the past when drug abuse was uncommon. Today, 53 percent of young people between 18 and 25 admit having used marijuana, National Institute on Drug Abuse, The Public Experience with Psycho-Active Substances: A Nationwide Study Among Adults and Youth (Oct. 1975). It is time to ask whether passive toleration of drug usage has become so prevalent as to strip this inference of all probative value.

lant's cousin, was not present in the apartment at the time it was raided but was arrested later.

The officers asked where the narcotics were, and Phoenix (not the appellant) led them to the living room closet, where twenty-seven baggies containing marijuana were hidden, and to the refrigerator where two bags containing a total of 270 tablets of L.S.D. were hidden. There was no testimony in the Government's case that appellant said or did anything indicating he was aware of the presence of *these* drugs, or that any of his clothing or other possessions were found in the living room closet.[11] Nor was there testimony that the presence of the L.S.D. would have been obvious to anyone using the refrigerator.[12]

Scattered around the living room in plain view were small quantities of marijuana. In an ashtray on the coffee table was a marijuana cigarette butt, and a "roach clip," a metal device for holding a burning marijuana cigarette while smoking it. A small quantity of marijuana was lying on the coffee table; the rug under it was found to contain marijuana seeds and residue. On the mantel piece in the living room were several small bags of marijuana, two small tinfoils of hashish,[13] several letters including one addressed to appellant,[14] and a postal scale which "could" be used to weigh narcotics as well as mail. A kitchen

11. Appellant took the stand in his own defense and admitted on cross-examination that a few of his possessions were in the living room closet. Tr. 616–17. However, in deciding whether the motion for judgment of acquittal at the close of the Government's case should have been granted, we do not consider evidence adduced later. *See Powell v. United States*, 135 U.S.App.D.C. 254, 257 n.9, 418 F.2d 470, 473 n.9 (1969); *Austin v. United States*, 127 U.S. App.D.C. 180, 189, 382 F.2d 129, 138 (1967).

Even if considered, this testimony is insufficient. All three inhabitants had possessions in the closet, although most were Phoenix's. Tr. 616–17. Thus, the closet was not under appellant's special control so as to warrant an inference that anything found there was under his dominion and control. *Cf. Walker v. United States, supra*, 489 F.2d 714. Absent description of the items belonging to appellant found there, it cannot even be inferred he used the area frequently, rather than for storage, and so knew of the narcotics, much less that he intended to exercise control over them.

Appellant never admitted he was aware of the drugs hidden in the closet and refrigerator. On the contrary, appellant testified he did not live in the apartment at all but with his girlfriend, *cf. Holland v. United States, supra* note 7, using the apartment only as a mail drop and occasionally sleeping there.

12. On the contrary, a number of legitimate prescription tablets belonging to Isaac were also seized.

13. I believe there was sufficient evidence to permit the jury to infer that appellant was in constructive possession of the hashish in violation of 33 D.C.Code § 402 (1973), and therefore join the majority in affirming that count of the indictment. Appellant was found in his underwear in close proximity to the hashish. Smoking pipes and other paraphernalia for use were present. Appellant admitted having smoked marijuana in the apartment in the past. Tr. 581, 595. The hashish was left out in the open. Although it is close, I believe that that is enough to permit the jury to infer that appellant knew about the hashish and intended to exercise dominion and control over it by use.

The requirements of *Holland, supra* note 7, were satisfied by appellant's having given the apartment as his address to the arresting officers. While appellant challenges the admission of the Police 163 Form showing this address, I cannot say the district judge—who observed the demeanor of the witness—abused his discretion in admitting the form based on the "refreshed recollection" of Officer Hill regarding his conversation with the appellant, Tr. 423–437, even though Hill remained unable to identify him.

14. The letter was admitted over appellant's timely hearsay objection to prove that he resided at the apartment. I agree that the letter was inadmissible as an implied statement by the sender, a declarant not present in court, that appellant received his mail at the address listed. *See United States v. Davis*, 506 F.2d 587 (6 Cir. 1974); *United States v. Jackson*, 469 F.2d 267 (9th Cir. 1972).

Nor is the problem cured by the "well-recognized presumptions relating to . . . regularity of the mail." Appellee's brief, 8 n.6. The presumption only applies if it is first shown the letter was *correctly addressed*. 29 Am.Jur.2d *Evidence* § 196 at 249–50. *See also Kiker v. Commissioner*, 218 F.2d 389 (4th Cir. 1955); *Flowers v. Aetna*, 163 F.2d 411 (6th Cir. 1947).

However, I am satisfied beyond a reasonable doubt that the admission of the letter was harmless error. The letter was cumulative with the Police 163 Form and appellant's own testimony that the apartment was his "legal and mailing address." Tr. 576.

scale (referred to by the brandname "Triner") was also seized from the kitchen table.

A search of the single bedroom disclosed several other small quantities of marijuana lying out in plain view, a grinder containing marijuana seeds, a number of smoking pipes and eighteen additional bags of marijuana hidden in the bedroom closet. However, the testimony regarding the items found in the bedroom was later stricken as hearsay, Tr. 220, 224, and could not properly have been considered by the jury in reaching its verdict. While it was later stipulated that these items were found *somewhere* in the apartment, Majority op., n.2, there was no competent evidence indicating they were in a place visible to the appellant or that he was aware of their presence.

### B.

If the Government had been content to charge appellant with simple possession of marijuana, there would be little doubt that the evidence was sufficient. Small quantities of marijuana—enough to suggest personal use but not distribution—were obvious throughout the apartment. Moreover, appellant testified that he had smoked marijuana in the apartment on several occasions. Tr. 580–81, 595.

But the Government chose also to prosecute all three roommates for possession with intent to distribute the *additional* large quantities of bagged marijuana hidden in the closet and the L.S.D. hidden in the refrigerator.[15] There cannot be much question that Phoenix knew about these drugs—he led the officers to them. But there is no evidence indicating that *this appellant* even knew they were there. And assuming he did, what evidence is there indicating *this appellant* intended to exercise dominion and control over them?

To my knowledge, no federal court has ever before held that someone can be convicted of constructive possession of drugs hidden in an apartment he shares with other people absent evidence linking him to the drugs. In a case the majority "decline[s] to follow," Majority op. at n.17, the en banc Third Circuit unanimously held directly to the contrary.[16]

**15.** *See* note 1 *supra.* The trial court suspended sentence and placed appellant on five years probation subject to the Youth Corrections Act, 18 U.S.C. § 5010(a), on all three counts concurrently. Since I agree that the conviction of simple possession of hashish should be affirmed, *see supra* note 13, appellant's sentence might not be affected by the two possession with intent to distribute counts. In such circumstances our practice when troublesome problems are present is to vacate the judgment on the additional counts. *See United States v. Hooper,* 139 U.S.App.D.C. 171, 432 F.2d 604 (1970). Even though no reduction in sentence follows, the additional stigma arising from convictions of possession with intent to distribute is certainly substantial.

**16.** *United States v. Bonham,* 477 F.2d 1137 (3rd Cir. 1973) (en banc). In *Bonham,* two brothers shared a bedroom. Both men were in the room when the officers entered. Heroin was discovered hidden in a recess above the doorway. An officer also testified that "suspected marijuana" and "suspected phenaphen tablets" were in plain view on a table. The Third Circuit reversed:

Here there was nothing except the joint occupancy of the room upon which an inference of possession could be based. A fact finder could only speculate whether both of the room's occupants or a particular one of them even knew of the cache, must less exercised control over the hidden contraband.
477 F.2d at 1139. Nor would the presence of small quantities of drugs in plain view warrant an inference of possession regarding the drugs which were hidden:

We have not overlooked the testimony of one of the searching officers that suspicious articles other than heroin were found in plain view on a table in the bedroom. But even if the prosecution had proved that these articles were marijuana and phenaphen, as the officer said he suspected, appellant's awareness of their presence would be no evidence of knowledge that heroin was concealed elsewhere.
*Id.* (This passage stands as an alternative rationale for the holding and is not dictum, as the majority asserts, *supra* n.17.)
*See also Moore v. United States,* 429 U.S. 20, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976) (per curiam). The defendant had been convicted of possession with intent to distribute heroin. The evidence showed that when the police entered the apartment identified by an informant, they found Moore and a woman in close proximity to bags of heroin and narcotics paraphernalia lying on and under a coffee table. The Supreme Court vacated the conviction because

### C.

Assuming constructive possession, the Government's case would still fail for lack of support for a finding that *this appellant* had the specific intent to transfer drugs. The majority relies on "the obvious nature of the large-scale processing activities" in the apartment. Majority op., —— of 183 U.S.App.D.C., 693 of 562 F.2d. Even if true, that utterly begs the question of whether *this appellant* was part of the operation, or was simply guilty of a poor choice of roommates. There is no support for the notion that mere presence at the site of a large-scale narcotics operation is sufficient to convict for possession with intent to distribute.[17] The majority's approach confuses possible toleration with active participation.

To be sure, the scales, the bags and other paraphernalia also tend to indicate *an* intent to distribute (as opposed to use). But *whose* intent to distribute? The fact that *someone* had packaged the marijuana for sale[18] and evidently intended to distribute

---

the trial judge had relied on inadmissible hearsay evidence to find that Moore was a tenant of the apartment at the time of the seizure. The Court also remanded to the Fifth Circuit to determine whether the error was harmless, *i.e.,* "whether or not the evidence of proximity alone, when viewed in the light most favorable to the prosecution, could suffice to prove beyond a reasonable doubt that Moore was in possession of the heroin". At 22, 97 S.Ct. at 30. The Court stated that the answer to this question "was far from clear," stressing that "the only competent evidence of Moore's possession of the narcotics was his proximity to them in an apartment in which another person was also present and of which he was not shown to be the tenant or even a regular resident". *Id.*

In the present case, the jury could have found that Davis was a tenant of the apartment. *See* note 13 *supra.* Yet *Moore's* more general message—that we should be cautious in inferring possession from the fact that one is found near drugs—remains relevant.

**17.** On occasion courts have upheld the inference of participation from mere presence at an illegal operation. *United States v. Gainey,* 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965) (moonshine still); *Beard v. United States,* 65 U.S.App.D.C. 231, 82 F.2d 837, *cert. denied,* 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382 (1936) (gambling parlor). However, those cases rest on the fact that the illegal activity was in active operation in the defendant's presence. Since such illegal activities are usually carried out clandestinely, *see United States v. Gainey,* 380 U.S. at 67–8, 85 S.Ct. 754, anyone allowed to witness them is probably a trusted confederate or customer. Moreover, the *Gainey* court, while upholding the statutory presumption against due process attack, pointedly questioned whether the inference from mere presence would be sufficient to support a conviction. 380 U.S. at 68, 85 S.Ct. 754.

There was no evidence here that the defendant was present while narcotics were openly being packaged for sale. *Cf. United States v. Moore,* 158 U.S.App.D.C. 375, 442, 486 F.2d 1139, 1206 (en banc) (MacKinnon, J., concur-

ring), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Davis,* 461 U.S. 1026, 1036 (3rd Cir. 1972). On the contrary, the quantities of narcotics *on which the possession with intent to distribute counts are based* were hidden in the closet and refrigerator. (The majority repeatedly glosses over this fact, treating all the drugs as if they were equally in plain view. *See, e.g.,* majority op., ——, —— – ——, —— of 183 U.S.App.D.C., 688, 689–690, 692 of 562 F.2d.) The so-called "paraphernalia" consisted of apparently innocent ordinary kitchen objects such as plastic bags and food scales. While their physical presence was "obvious," their use for an illegal purpose was not. I do not contend that they were not in fact used for packaging marijuana, but only that Davis cannot be presumed necessarily to have known of their illicit use or to have so used them himself.

The District once had a statute making it a crime to be present in an establishment where narcotics drugs are sold with knowledge thereof unless "[one] gives a good account of his presence". 22 D.C.Code 1515(a) (1973). That statute was declared unconstitutional in *Holly v. United States,* 150 U.S.App.D.C. 287, 464 F.2d 796 (1972). However, it is unlikely that Congress would have felt the need for such a statute in the first place if, as the majority apparently believes, someone present at a "large scale narcotics operation" was already guilty of the more serious offense of possession with intent to distribute.

**18.** The majority also appears to rely on the fact that the baggies of marijuana hidden in the living-room closet were a large quantity. Majority op., ——, —— of 183 U.S.App.D.C., 684, 685 of 562 F.2d. However, the witness who testified for the government was only willing to say that it was more than *one* person would have for his own use, not more than three might. Tr. 347. This was no slip of the tongue. Immediately before, the expert testified the quantity of phencyclidine was more than one person might have for his own use. Tr. 346. When the prosecution followed up by

it does not indicate that *this appellant* was part of a conspiracy to do so.

### D.

To prop up its shaky conclusion, the majority argues that Davis' intent to sell the drugs is also shown by the fact that "he continued to pay one-third of the rent of the apartment, where this illegal operation was centered, for several months after his only admitted use of the apartment was for 'the purpose of a mailing address' (Tr. 623)." Majority op., —— of 183 U.S.App. D.C., 688 of 562 F.2d. Opining that "[y]oung people do not ordinarily pay rent on apartments for such a limited purpose", the majority argues that the jury could have concluded that Davis wished to conceal "some joint monetary purpose" he had for paying rent, *i.e.,* "to participate in selling the drugs". *Id.*

For obvious reasons, this theory was not argued to the jury at trial or to the judge on the motion for judgment of acquittal, was not relied on by the Government on appeal, and was not among the several theories suggested from the bench during oral argument. First, the majority misstates the facts. Davis did not testify that he used the apartment *solely* as a maildrop; he also slept there and kept some of his possessions there while he was living with his girlfriend.[19] There is no basis for doubting that Davis would continue for several months to pay $38 to $41 a month for this convenience, unless one were to assume the very proposition that his rent payments are claimed to prove (*i.e.,* that they had no innocent purpose). Moreover, even if one accepted the majority's characterization of the facts and agreed that a young person is unlikely to pay this sum for a mailing address and must have some "other purpose" for paying rent, the majority's view of what that other purpose might be is purely speculative.

Second, the majority contradicts itself. In the denying that Davis used the apartment enough to justify his share of the rent, the majority seems to forget its own earlier statement to the contrary. To establish constructive possession, the majority states the jury could have found that Davis lived in the apartment;[20] to establish intent to distribute, the majority states the jury could have found that he did *not* live there and therefore must have continued to pay rent for "some other purpose." In light

---

asking if *three* people might have that quantity for their own use, the expert admitted they might. Tr. 346. As a result, the trial court dismissed the counts relating to possession of phencyclidine with intent to sell. Tr. 498–500.

The trial judge did not dismiss the marijuana counts relating to possession with intent to distribute even though the testimony was identical to that he had found insufficient regarding phencyclidine because he incorrectly remembered the expert testimony. His recollection was that the expert had said the marijuana was more than three people would have for their own use. Tr. 508. To compound the mistake, the prosecutor's closing twice misrepresented to the jury that the quantity of marijuana was more than *three* people would have for their own use. Tr. 747; 753.

**19.** Tr. 616, 624. After his direct examination, Davis agreed that his "place of abode" was his girlfriend's residence and that it was an "extraordinary situation" when he stayed at the Third Street apartment. *Id.*

**20.** To avoid the impact of cases such as *United States v. Holland, supra* note 7, 144 U.S.App. D.C. 225, 445 F.2d 701, and *Moore v. United States, supra* note 16, 429 U.S. 20, 97 S.Ct.

29, 50 L.Ed.2d 25, which indicate that an occasional visitor is not presumed to be in constructive possession of contraband found in an apartment (even if it is in plain view), the majority states, "whereas in *Moore* [there was no admissible indicia of residence,] the fact finder in this case could find on the basis of competent testimony that appellant *lived* in the apartment." Majority op., n.14 (emphasis in original). *See also* majority op., —— – —— of 183 U.S.App.D.C., 684 of 562 F.2d.

Of course, the precise question is not whether Davis "lived" in the apartment, but the "regularity with which [he] occupied the place". *United States v. Holland, supra* note 7, 144 U.S.App.D.C. at 227, 445 F.2d at 703. To establish constructive possession, the government must show, *inter alia,* that Davis spent enough time in the apartment to impute to him knowledge of the marijuana hidden in the closet and the LSD in the refrigerator. *See* text at notes 3–4 *supra.* If one reads the evidence to show that Davis slept in the apartment frequently enough to be presumed aware of the hidden marijuana and LSD, then there can be nothing suspicious about his paying rent.

.

of the jury's verdict, we are required to give the Government the benefit of all reasonable inference from the evidence. But it is not reasonable to assume that the jury could have simultaneously both accepted and rejected Davis' testimony that except for "extraordinary situations," Tr. 624, he lived with his girlfriend rather than in the Third Street apartment.

### III

The legal principles enunciated above do not exist merely to preserve the law's logical consistency or precision. Reflecting that caution so basic to our jurisprudence, their purpose is to bar the imputation of guilt based on one's associations, thereby preventing the chance of mistake and injustice when the evidence fails to indicate which of several suspects should be held responsible for drugs found in their shared residence.

In this case, however, the evidence is not merely silent about which of the three roommates participated in selling the hidden marijuana and LSD. Out of the presence of the jury, the prosecutor stated that Phoenix was "the main target in the case." Tr. 679. The Government also supplied information for use in the presentence report indicating Phoenix was the "main drug dealer on the Howard University campus." An undercover informer, who did not testify, had actually purchased drugs at the apartment from a "Felix," someone he presumably could have identified as Phoenix. Finally, a ledger recovered from the apartment recorded narcotics sales by Phoenix and the third co-defendant, but not this appellant. Tr. 304–12; 365–71. The prosecutor frankly conceded the ledger incriminated the other two defendants but not Davis. Tr. 37–38. For various technical evidentiary reasons, none of this information was brought to the attention of the jurors, who convicted all three defendants alike.

These indications that appellant Davis had no part in the selling of the marijuana and LSD found concealed in his apartment underscore the prudence of the principles reviewed in Part II. But evidence of possible innocence is not a prerequisite to the activation of those principles. To the contrary, their purpose is to assure that no one is convicted simply because he is unable to refute an inference of guilt drawn from his proximity to drugs or his association with dealers. It is because the majority so carelessly disregards these legal safeguards that I dissent.